[Civ. No. 22420.   First Dist., Div. Two.   Oct. 21, 1965.]

THE COUNTY OF CONTRA COSTA, Plaintiff and Appellant, v. WILLIAM T. NULTY et al., Defendants and Respondents.

John A. Nejedly, District Attorney, and James H. Disney, Deputy District Attorney, for Plaintiff and Appellant.

Tinning & DeLap, James E. Cox, and Bernard F. Cummins for Defendants and Respondents.

AGEE, J.—The condemner in this eminent domain action, County of Contra Costa, appeals from the judgment entered upon a jury verdict. The subject property is a 100′ x 100′ corner lot in the city of Martinez. No compensation is claimed for any improvements thereon.

Respondent Rose Nulty Evans, as a coowner, testified that the value of the lot was ''between fifty, fifty-three. I'm only guessing.'' Each side called one expert witness. Respondents' expert (Wallace) testified to $50,000 and the county's expert (Foley) testified to $32,500. These were the only valuation

witnesses. The jury awarded the full amount asked for, $50,000.

██ The county contends that the jury was improperly influenced and the amount of its award was materially affected by the misconduct of respondents' counsel with respect to the county's failure to call one Johnson as a valuation witness and that the trial court compounded this error by giving the following jury instruction proposed by respondents: "If you find that either party wilfully concealed or destroyed evidence in order to prevent its being brought before the Court in this trial, you may presume that the evidence, if presented, would have been adverse to him, and you may consider his conduct in determining the merits of his case."

This instruction appears in the 1964 Pocket Parts of BAJI as No. 30-B (New). It has not as yet been considered in any appellate decision called to our attention. The editors of BAJI state: "This instruction is designed for the relatively *rare case* where there has *actually been a fraudulent suppression* of evidence. . . . It is prejudicial error to give this instruction if there is no showing of *fraudulent* suppression." (Italics added.)

As applied to the instant case, the instruction by necessary implication advised the jury that it had the right to find that the county had "wilfully concealed or destroyed evidence" and that, if it so found, it could consider such conduct "in determining the merits" of the county's side of the case.

In determining whether there is any substantial evidence to support such a finding, we must and shall consider the evidence in the light most favorable to respondents. In considering the probable effect upon the jury's verdict of the instruction complained of, it is necessary to set forth the background in some detail.

Johnson had been employed by the county three weeks before trial to investigate and appraise the subject property. Respondents' attorney, James E. Cox, knew of such employment prior to trial.

The trial started on Monday, March 16, 1964. Respondents completed their case in chief on Wednesday morning, shortly after court convened. The county thereupon called appraiser Foley. He had made an appraisal report for the county in December 1961 and had recently brought it "up to date," i.e., to the agreed valuation date of January 4, 1964.

In compliance with the pretrial order that required appraisal reports to be exchanged, Mr. Cox had been provided

with a copy of Foley's report prior to trial. He had no appraisal report by Johnson because, as the evidence showed, Johnson never made one.

Without objection, Mr. Cox elicited from Foley that Johnson had been employed by the county to investigate and report on the value of the subject property. He then asked Foley if he knew Johnson's opinion as to such value and the witness stated that he did not.

Mr. Cox then asked: "Have you heard any discussion that his values were so high the County Right of Way Department—" After objection and discussion, the court stated: "The thing we are getting into here, Mr. Cox, is when the witness testifies that he does not know and you elaborate further, the impression created for Mr. O'Malley [county counsel] is that perhaps you don't care whether he [the witness] knows or not but you are simply asking the question for the benefit of the jury." To this Mr. Cox replied: "Well, I am not going to stop at this time with this man, Your Honor. I can assure you of that."

The tenor of what transpired thereafter is indicated by the next question asked by Mr. Cox. "Have you heard any discussions that Mr. Johnson's opinion of value was a lot higher than yours?"

Except for proving the correct sale price of a comparable parcel, referred to by respondents' expert in his testimony, the county rested its case in chief upon the completion of Foley's testimony. (The parties stipulated to such sale price later that afternoon.)

Mr. Cox thereupon called James D. Fears, a right-of-way agent employed by the county, as a witness. Fears testified to a meeting with Johnson about five or six days before the trial started, at which time Johnson asked for and was given additional data concerning the subject property.

Mr. Cox asked Fears the following question: "Didn't he [Johnson] indicate to you he was thinking around forty, forty-five thousand for this property?" Following an objection to the question, Mr. Cox stated: "I'll back up and lay further foundation, if I may."

The following occurred thereafter: "Q. All right. Now, in this conference present with yourself and Mr. Derana [Fears' superior], were any statements by Johnson made as to his thinking on the value of the Miller and Evans parcels? A. Yes, there were statements made. Q. And they were a lot

higher than any evidence that's been offered here by the County, weren't they?''

Fears answered ''Yes,'' adding the following: ''Mr. Johnson did mention figures, and at the same time he said, 'Although this is not my final figures, I have considerable more investigation to do yet. This is my thinking at the present time.' And this is as far as we went.''

Mr. Cox then asked the following question: ''And where was he, what range, at this time, as you recall?'' Objection was made and the court excused the jury. In the ensuing discussion, the court indicated that it was of the opinion that any testimony by Fears as to what Johnson may have said as to the value of the subject property would be hearsay. Mr. Cox asked the court, ''You are saying I can't go into the figures [with Fears]?'' to which the court replied that he could not.

After the jury was brought back and the trial resumed, Mr. Cox asked the witness Fears: ''Were you alarmed at what Mr. Johnson was telling you about the value of this property?'' An objection was sustained.

However, Mr. Cox persisted. ''Q. And I believe you told us just before the recess that Mr. Johnson's figures were higher than the evidence offered here, is that right? A. That's correct. Q. And what were his figures as expressed to you and your boss at that time?'' An objection was sustained.

More of the same followed. ''Q. The meeting ends; Johnson giving you some figures that I can't go into with you, but he keeps on working for the County. Is that right? A. Johnson did not give me any figures. He told me at that time he had not completed his report yet. Q. Well, I thought you testified here before the recess that he had given you some figures that were higher—his thinking was higher than any evidence offered here. Did you so testify? A. I did, Mr. Cox. If I may answer it. I am not trying to be evasive, sir. I am just trying to tell you what actually happened is the fact that he didn't give me any final appraisal figures on this. We did discuss figures, yes; I did say that. He told me he had not completed his report as yet and there was some aspects of the comparable sales that he would like to go over with me. . . . Q. And Johnson, as I understand it, indicated he had these figures that I can't go into with you, but he wanted to do some further checking. Is that right? A. That's correct.''

Mr. Cox went back to the subject once again. ''Q. Did he [Johnson] give you a range of what his testimony would be? A. Yes, sir, he did. Q. What was that range? The Court: Now, Mr. Cox, we have already excluded this type of evidence.

Mr. Cox : I know, Your Honor, but I'm trying to complete my record, and I know Your Honor is going to rule against me but I have an obligation to cover the base.''

Mr. Cox thereupon continued to question Fears as to why he had not contacted Johnson to find out if the latter had completed his appraisal report. Fears explained that he did not because he had been advised by the county's counsel that he did not intend to call Johnson as a witness. This completed Fears' testimony.

The court then asked Mr. Cox if he had any further rebuttal, to which he replied: ''Your Honor ruled I can't go into Mr. Johnson without bringing him in here so I want him here.'' Mr. Cox then asked the county's counsel: ''Would you like him here?'' to which the latter replied: ''Very definitely. I've got a process server out . . . [but] I told him they didn't have to serve him until late today [Wednesday].''

The record does not disclose what efforts were made by the county's process server to serve Johnson. However, on the following morning (Thursday) Mr. Cox called one Leo Miller as a witness. He testified that Mr. Cox's office had requested him to serve a subpoena upon Johnson; that he first started looking for Johnson ''Yesterday evening''; that ''I checked last night and nobody answered the bell, and when I called there was—nobody answered the phone''; that he was first able to contact anyone at Johnson's home ''About 7:30 this morning''; that he ''talked to Mrs. Johnson this morning'' and that she said Mr. Johnson was not home; that he did not get any information from her or any of Johnson's business associates as to where he could find Johnson.

The case was submitted to the jury on this state of the record. It did not have the benefit of the affidavit executed by Johnson in support of the county's subsequent motion for a new trial.

In this affidavit, the allegations of which are not denied, Johnson averred that on Wednesday (third day of trial), about 6:45 p.m., ''I returned a telephone call from attorney James E. Cox about another matter at which time he informed me that he had sent out a process server to serve me with a subpoena requiring my presence as a witness in the above condemnation action.'' Johnson's reply was, ''I made it known to Mr. Cox during that conversation that I would not make myself available for a subpoena in view of my employment with the County.'' Johnson further averred that he had had no contact with the county since the Saturday preceding the start of the trial.

A substantial part of Mr. Cox's argument was devoted to the failure of the county to call Johnson as a witness. Some excerpts follow. ''I am going to argue here to you . . . that this Plaintiff has sought in this proceedings to deny my clients their rights to just compensation by its own conduct, and I'm going to argue that fully, . . .'' ''We couldn't go into these statements of value except 'they were a lot higher, yes.' What's the figure? I submit it helps to prove our case more than any single thing that's happened in this proceedings, and this plaintiff and nobody else should do this type of thing to people under our system.'' ''Now, with regard to my wanting to prove Johnson's figure through Fears. Of course, I wanted to prove it through Fears.'' ''And I say to you that this plaintiff had an obligation to tell you and have this man [Johnson] here to tell you what that appraisal was, to take a look at him and hear from him.''

Respondents contend that any error respecting the nonproduction of Johnson by the county was cured by the giving of the following instruction: ''Neither the plaintiff nor the defendants is required to call as witnesses all persons who are shown to have been present at any of the events involved in the evidence, . . . When a witness is equally available to both parties, neither may complain because the other did not call him, and no presumption can be drawn against either for failure to call such witness.''

We cannot agree with respondents' contention. It is very evident from the trial record herein that respondents' purpose in requesting the giving of the criticized instruction was to give judicial weight and dignity to their argument to the jury that the county's decision not to call Johnson as a witness amounted to a fraudulent suppression of evidence by the county. We do not believe that the prejudicial effect of the giving of this instruction, which was so patently directed to the nonproduction of Johnson, was overcome by the giving of the general instruction referred to above.

Our review of the record herein convinces us that this is not the ''relatively rare case'' spoken of by the editors of BAJI, wherein it could be found that ''there has actually been a fraudulent suppression of evidence'' and we agree with them that ''It is prejudicial error to give this instruction if [as in the instant case] there is no showing of fraudulent suppression.''

We are further of the opinion that such error was magnified by the persistent misconduct of respondents' attorney in seek-

ing to evade the trial court's ruling that any testimony by Fears as to Johnson's opinion of value would be hearsay.

To quote a recent statement by our Supreme Court, "Although it is impossible to determine simply by looking at the amount of the award whether the jury was influenced by the misconduct, the clear inference is that the jury was so influenced. The question is not whether the award is a reasonable one, but whether it is reasonable to conclude that a verdict more favorable to . . . [the county] would have been reached but for the error." (*Garden Grove School Dist.* v. *Hendler*, 63 Cal.2d 141, 144 [45 Cal.Rptr. 313, 403 P.2d 721].)

Judgment reversed.

Shoemaker, P. J., concurred.