Filed 10/16/14  Johnson v. Oakhurst Industries CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| AARON JOHNSON, a MINOR, etc., | |
| Plaintiff and Respondent, | E056044 |
| v. | (Super.Ct.No. RCVRS084985) |
| OAKHURST INDUSTRIES, INC., | **OPINION** |
| Defendant, Cross-complainant and Appellant; | |
| DEBRA JOHNSON, | |
| Plaintiff, Cross-defendant and Respondent. | |

APPEAL from the Superior Court of San Bernardino County.  Ben T. Kayashima, Judge.  (Retired judge of the San Bernardino Super Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Reversed.

Mardirossian & Associates, Inc., Garo Mardirossian, and Lawrence D. Marks, for Plaintiffs and Respondents.

1

Hayes, Scott, Bonino, Ellingson & McLay, Mark G. Bonino, Miya R. Peard, Donald Ross Franson III; Osman & Associates and Richard Scott; Koeller, Nebeker, Carlson & Haluck and Gary Hoffman for Defendant and Appellant.

This is the second trial regarding an accident occurring on January 8, 2003 at the transition road from the southbound Interstate 15 to the westbound Highway 210. In the scope of his employment with defendant Oakhurst Industries, Inc. (Oakhurst), David Avalos was driving an Oakhurst tractor-trailer on the transition road when he collided with a Ford Explorer driven by Plaintiff Debra Johnson (Debra). Debra's son, Plaintiff Aaron Johnson, was in the passenger's seat. The Ford rolled over several times and she and Aaron sustained severe injuries. The sole issue of liability turned on whether Avalos drifted into Debra's lane or Debra veered into Avalos's lane.

In the first appeal, the jury found against the Johnsons. We upheld the grant of the Johnsons' motion for new trial based on juror and attorney misconduct. (*Aaron Johnson v. Oakhurst Industries, Inc.* [September 21, 2010, E047807], nonpub. opinion (Op.).) Thus, a second trial was conducted and the jury found Oakhurst liable under a theory of negligence and Debra and Aaron were entitled to damages in a bifurcated proceeding.

Oakhurst claims on appeal as follows:

1.    Instruction to the jury on willful suppression of evidence (CACI 204) was prejudicial and requires reversal of liability.

2.    The trial court erred by making inconsistent rulings on the admission of the responding officers' opinions as to the cause of the accident.

2

3.    The trial court erred by admitting a denial of a Request for Admissions made by Avalos before the first trial.

4.    Oakhurst is entitled to an offset of the award of damages to Debra based on the settlement between her and Ford Motor Company.

We conclude that instruction to the jury with CACI No. 204 was prejudicial.  As such, we reverse the liability finding.[1]

I

PROCEDURAL BACKGROUND

On January 6, 2005, the Johnsons filed their complaint for personal injury damages against Avalos, Penske Truck Leasing Corp., Ryder Truck Rental, Inc., Ford Motor Company, and Bridgestone/Firestone North American Tire, LLC.  According to the complaint, the accident occurred when Debra's Ford collided with a tractor and connected trailer (tractor-trailer) driven by Avalos.  The complaint alleged negligence on behalf of Avalos.  The complaint also alleged product negligence, products liability, and breach of warranty against Ford Motor Company.  It additionally alleged product negligence, strict products liability, and breach of warranty against Bridgestone/Firestone North American Tire, LLC.

The Johnsons settled with Ford Motor Company prior to trial for $250,000 and Ford Motor Company was dismissed from the action.  Penske Truck Leasing Corp.,

---

[1]    Since we reverse liability, the damages award is also reversed.  As such, we need not address the issue of offset of damages.

3

Ryder Truck Rental, Inc. and Bridgestone/Firestone were dismissed. Avalos was also dismissed.

The first trial was conducted and resulted in a defense verdict. The trial court granted a motion for new trial on the grounds of juror misconduct and misconduct of counsel. This court affirmed the trial court's order granting a new trial. (Op.)

Prior to the second trial, the Johnsons brought several motions in limine (MIL). We will discuss the relevant motions in more detail, *post*.

On September 30, 2011, the jury reached its verdict. The jury responded yes to the question: "Was David Avalos, the employee of defendant, Oakhurst Industries, Inc., negligent?" As to Debra and Aaron, they also responded yes to the questions that Avalos's negligence was a "substantial factor in causing harm to Debra Johnson and Aaron Johnson." They found that Debra was not negligent.

After a damages trial, Debra was awarded $554,248 and Aaron was awarded $2,100,728. Oakhurst filed a timely appeal. Oakhurst filed its notice of appeal on April 2, 2012.

II

FACTUAL BACKGROUND

A. *Plaintiff's Case*

1. *The accident*

In 2003, Debra Johnson worked as a supervisor at a federal detention center in Los Angeles. On the day of the accident, she picked up her son Aaron from school and was driving to her father's house in Los Angeles. Aaron stayed with Debra's father while she

4

worked. Debra recalled driving on the connecting transition to the 210 freeway when she was hit by a tractor-trailer. She did not recall anything that happened after that. The accident occurred around 3:00 p.m.

Lloyd Vogel was transitioning from the southbound 15 onto the westbound 210. He was in Lane 1. Vogel observed Debra's Ford veer to the left off the road and roll over in front of him. He did not see the Ford and tractor-trailer impact. He did not recall seeing the tractor-trailer in the other lane. Lane 1 did not require a switch in lanes to transition onto the 210 freeway.

Avalos was hired by Oakhurst in 1994. His regular route in 2003 was from Commerce, California (where Oakhurst was headquartered) to Las Vegas, Nevada, and back. In 2008, Avalos denied a request for admission that he was using his cellular telephone at the time of the accident. At trial, Avalos admitted that he was on his cellular telephone at the time of the accident. He believed it was in violation of company policy. He was using a wireless headset.

CHP Officer Christopher Steven Forbes estimated that he investigated between 10 and 20 traffic collisions each month. He had investigated over 100 accidents involving trucks and passenger vehicles. He responded to the scene of the accident. He wrote the Traffic Collision Report (TCR).

Avalos told Officer Forbes that there were no passengers in his truck.[2] Avalos denied to Officer Forbes that he was using a cellular telephone at the time of the accident.

---

[2]     Avalos admitted at trial that Jose Magallenes was in the sleeping berth.

Avalos told Officer Forbes the accident occurred while he was driving southbound on the I-15 freeway transitioning to the 210 freeway west. He was in Lane 2. Debra was in Lane 1 and suddenly drifted into Lane 2. Her car hit the side of the trailer. Debra went back into Lane 1 but was out of control. Officer Forbes recalled that Avalos told him that Debra went in front of him into Lane 2 and then back into Lane 1. Debra's car then started to overturn off the side of the roadway. Avalos immediately pulled over. A video simulation of the accident was shown to the jury.

After the accident, Avalos went to the Johnsons' car. Debra was badly hurt. She had a gouge in her head. She was making gurgling sounds. Officer Forbes acknowledged there was no physical evidence at the scene of an impact in Lane 2. Some of the wheels on Debra's Ford were knocked off during the rollover. The area where the accident occurred and where the tire marks were located was a straight highway.

Officer Forbes did not recall Debra saying that she was running late.

CHP Officer Jeff Briggs took measurements of the skid marks. All of the tire marks were in Lane 1. Debra had been partially scalped and there was a large amount of blood coming from her wound when he arrived. A helicopter came to the scene to transport Aaron. All the tire skid marks came from the Ford. Lane 1 of the transition road merged into Lane 2.

Debra's Ford was red. Officer Forbes did not recall any red paint transferred to the trailer. Officer Forbes never saw Magallenes. There was no physical evidence that was contrary to how Avalos stated the accident occurred.

6

Officer Briggs recalled that Debra mentioned she was now going to be late for work. Officer Briggs found no evidence on the roadway that he was able to rely upon to determine the area of impact.

CHP Officer Chad Kaplan had extensive experience in accident investigation. He inspected the Ford Explorer after the accident. He completed a full inspection of the mechanical workings on the Ford. The wheels on the passenger side of the vehicle had come off during the rollover. The brakes did not fail. There were no mechanical issues that would have caused an accident. [3]

Kaplan determined that the Ford was out of alignment. However, Debra should have been able to keep the Ford straight. If a person took their hands off of the steering wheel while it was out of alignment, the vehicle could veer to the right or left, not necessarily to the right. Three of the tires were worn enough that they should be replaced.

Mark Rafferty had been employed by Oakhurst for 10 years as a distribution transportation manager. In 2003, Avalos was subject to certain rules and regulations provided by the company. Rafferty had provided the fleet safety manual in response to a request by the Johnsons that it give all company manuals preceding the accident. In 2007, Oakhurst provided the current safety manual to the Johnsons that was promulgated

---

[3] Oakhurst objected to this question and answer but the objection was overruled. The trial court explained it was different from the other opinions and conclusions because it dealt with the components of the vehicle. It did not amount to testimony that Debra was at fault which was the other opinions.

7

on September 11, 2006.  (Exhibit 100.)  Rafferty agreed it was not a good idea to talk on a cellular telephone while driving a tractor-trailer.

Rafferty indicated that a truck driver was required to report to his or her supervisor any accident causing property damage or personal injury.  Rafferty provided that an accident report kit must be prepared and the drivers are subject to drug testing.  Exhibit 100, rule 26 of the 2006 manual, also stated that a driver was not to use a cellular telephone while driving the tractor or any company vehicle.

Rafferty stated an accident report kit included a form, disposable camera and pencil.  Avalos did not complete a kit for this accident.  Avalos was required to submit to alcohol and drug tests within 32 hours of an accident; he did not.  Preserving the details of an accident was important for Oakhurst.

The tractor-trailer in the accident was a diesel truck.  Rafferty was not aware if the engine had a data recording device or "black box."  The tractor-trailer did have a Teletrac system which was used to keep track of the location of trucks.  Teletrac data was kept by another company which would have purged the data after six months.  Rafferty never thought to preserve the Teletrac data.  Teletrac would not provide which lane the truck was in.  The data was not purged by Oakhurst.  Rafferty indicated that Oakhurst leased all of its trucks from Ryder and Penske.

Avalos did not put the accident on his driver's log which he must complete for each trip.  Avalos signed a fleet safety manual in 2000.  Avalos was not an employee of Oakhurst in 2006.  No new safety manual was in place between 2000 and 2006.  The

8

2000 rules provided nothing about cellular telephone use. The 2000 rules also did not require an accident report kit be completed or drug and alcohol testing.

### 2. *Accident reconstruction expert testimony*

Steven Bellino was an expert in traffic accident reconstruction. He had reconstructed over 4,000 accidents. He had qualified as an expert in court over 200 times. Bellino was hired by the Johnsons to reconstruct the accident. Bellino reviewed the TCR including all of the tire marks and skid marks.

He created a layout of the marks and lanes based on the TCR. He also reviewed Avalos's deposition testimony, Avalos's driving log, Avalos's cellular telephone records, and the 2006 fleet safety manual which provided for drug and alcohol testing, accident reports and prohibited cellular telephone use. Bellino looked at the photographs from the scene taken by CHP officers. He also looked at Magallenes's testimony and the defense experts' testimony from the first trial. He looked at the weight of each vehicle.

Bellino concluded that it was more probable that the accident occurred when Avalos made an unsafe lane change from Lane 2 to Lane 1 and struck the Ford Explorer. The Ford Explorer was forced out of control and Debra tried to regain control. She was unable to gain control and the vehicle rolled off the roadway. Bellino relied on the contact damage. Based on the damage, the tractor-trailer was traveling faster (60 miles per hour) than the Ford (50 miles per hour) and was passing the Ford when the collision occurred. The Ford was struck at the right side mirror.

It was clear that the Ford lifted off to the side which would have only been caused by the heavy weight of the tractor-trailer pushing into the Ford. Bellino concluded that

9

Avalos's use of a cellular telephone would have caused him to have divided attention and was a contributing factor to the accident.

Computer animation of the accident was presented to the jury and was based on Bellino's opinion as to how the accident occurred. It showed the tractor-trailer drift into the Ford's lane. Debra's car was moved to the left then she corrected to the right, and then she tried to correct to the left to avoid the tractor-trailer and the rollover began.

There was no physical evidence on the roadway that Avalos had applied his brakes forcefully. Avalos's phone records show he was on his cellular telephone during times that he put on his log that he was in the sleeping berth.

The factors Bellino considered in determining that Avalos hit Debra was that there was only physical evidence in Lane 1, Lane 2 ended, Avalos was on his cellular phone which distracted him, Avalos was late, Avalos had little room in his lane to negotiate, Avalos did not complete an accident report kit, Avalos may have been alone in the tractor-trailer, the electronic data from the truck had been erased, and Avalos refused a drug test.

Bellino discounted Avalos's version of the events. Debra's car would have left marks in Lane 2 if it occurred the way he stated. There was no physical evidence supporting Avalos's statement. Also Bellino said the defense experts only relied upon Avalos's statements and improper calculations. The maneuvers that Debra would have had to make in their simulations were impossible.

Bellino explained that a black box from a diesel engine would record the distance, speed and time stopped. Bellino admitted that there was no physical evidence in any lane

10

at the time of impact. His opinion that Avalos was going faster was based on the scrapes on the tractor-trailer which he could evaluate based on his training and experience. The rise of the Ford was evidenced by the scrapes on the tractor-trailer. It was the first time at trial that he made this statement. Prior to trial he stated there was no direct or circumstantial evidence supporting the impact.

Avalos would have approached behind the Ford and then drifted into the lane. Bellino did not believe the alignment or tires on the Ford contributed to the accident.

B.    *Defense Case Regarding Liability*

Debra did not recall any problems with her brakes prior to the accident. Debra previously testified that she was having trouble with the brakes on the Ford. Since Debra bought the Ford in 2000, she had replaced the tires three times leading up to the accident. Debra admitted that she first said the truck that hit her was yellow but the Oakhurst tractor-trailer was white.

Debra did not recall telling officers at the scene that she remembered nothing about the accident. She recalled that she felt a jolt when the tractor-trailer hit her Ford. Debra had a recent inspection of the Ford prior to the accident and everything was working normally.

Tim Long, an expert in accident reconstruction, was hired by Oakhurst to create a 3-D model of the scene with the vehicles and the physical evidence. In creating his model and animation, he looked at the photographs, the TCR and other animations that had been created by both parties. Long had recently visited the scene and took 3-D pictures. He was able to recreate where the tire marks were located. Long put the Ford

11

Explorer in the model of the scene to match how it would move through the tire marks. Long believed that the model created by the Johnsons had the first tire mark in the wrong place.

Edward Phillips testified as the reconstruction expert for Oakhurst. He was hired in 2005 to look at the case. Phillips had reviewed the work performed by the Johnsons' experts and had inspected the tractor-trailer and the Ford.

The impact occurred somewhere west of the first tire mark. There was no physical evidence of impact. The merge sign for Lane 2 into Lane 1 was about 470 feet from the point of impact. The first tire mark was made by the left rear tire of the Ford Explorer. It was placed while Debra was trying to correct the Ford back to the right. The tire mark allowed Phillips to determine the speed of the Ford and where it came from. Phillips concluded that the impact occurred in Lane 2. The first tire mark was inconsistent with the theory that the tractor-trailer moved into Lane 1 and hit the Ford. The marks would have been left further to the side of Lane 1 if she was impacted while still in Lane 1. The impact occurred between one and five feet into Lane 2.

As the Ford moved back from the first tire mark, it would be heading back toward the tractor-trailer. The second and third tire marks were made by the right tires of the Ford. The animation of the reconstruction (prepared by Long) was played for the jury. All of the tire marks were left by the Ford. At the time of impact, there was not enough force on the tires to leave any mark.

The point of impact on the Ford was the passenger side view mirror. Phillips discounted Bellino's theory that the Ford lifted up upon impact by the tractor-trailer as

12

the 3,900 pound Ford could not be lifted up by the mirror. The contact was brief. Phillips opined that if the tractor-trailer had moved into the Ford's lane, there would have been more contact between the vehicles on the sides because the tractor-trailer could not change its location on the roadway as quickly as the Ford.

The Teletrac system on the tractor-trailer could not provide the point of impact. The black box would not have shown positions of the vehicles at the time of the collision.

Phillips believed Avalos's description of the accident because it was consistent with the ground evidence. Phillips had not seen any driving log books prepared by Magallenes. When Phillips reached his opinion in 2008, he did not know Avalos was on his phone at the time of the accident. Phillips had asked about any data recording system on the tractor-trailer when he was hired, but there was no information available on the subject. It was Phillips's opinion that the information from the data recording would not contradict the ground evidence. Phillips said the physical evidence did not support that the Ford went into Lane 2 in front of the tractor-trailer.

Stephen Werner was a mechanical engineer. He worked exclusively analyzing various types of accidents. Werner was hired by Oakhurst to review Officer Kaplan's evaluation of the Ford and the alignment. Werner was asked to determine whether the measurements of tire tread and determination that the vehicle was out of alignment would have caused the Ford to drift in a particular direction. The tire wear showed that the Ford was not properly aligned on the front end. Werner concluded that the Ford would drift to the right if the steering wheel was not held to make the vehicle go straight. He could not conclude it caused the accident.

13

Avalos was recalled. He started driving for Oakhurst in 1994. The tractor-trailer he was driving was leased. He had been driving the route from Commerce to Las Vegas for seven years.

Avalos left Commerce at 6:00 p.m. on January 7. He and Magallenes switched off driving all night. Avalos used a headset with his phone while driving. Magallenes used his cellular telephone during the trip. Avalos called Oakhurst twice after the accident.

Avalos was driving in Lane 2. Avalos called his wife prior to entering the transition road and was on a headset. He first saw the Ford Explorer in his left side mirror. It drifted into his lane. The Ford then hit the trailer. The Ford hit the trailer on the right front side and the front mirror. Avalos slowed down. He lost sight of the Ford but then saw it again coming toward him in the driver's side mirror. Avalos applied the brakes. He then observed the Ford roll over twice. Avalos pulled over to the shoulder and stopped. Avalos never told Officer Forbes that the Ford came into his lane in front of him.

Avalos had no drugs or alcohol in his system. Avalos never refused to take a drug or alcohol test of any type after the accident. Avalos tried to call Oakhurst several times while at the accident scene but was unable to get through. Avalos reported the accident to his supervisor.

Avalos signed the fleet safety rules on July 14, 2000. These rules said nothing about cellular telephone use. He had not signed any other safety rules.

Jose Magallenes was still employed by Oakhurst. Magallenes oftentimes borrowed Avalos's cellular telephone during the trips.[4] They switched off driving and sleeping. Magallenes was sleeping when the accident happened. Magallenes felt the truck stop. He asked Avalos why they had stopped and he told him there had been an accident. Magallenes kept copies of his driving logs for one month and then threw them away in the normal course of habit. He gave originals to Oakhurst. Magallenes stated at one point he had not talked to any officers but later stated he showed the log book to Officer Forbes. Avalos told Magallenes that the Ford came into his lane. Prior to trial, Magallenes had stated, "He said the SUV cut in front of him and that he hit it and then the SUV lost control and he hit it a second time." However, another time at a deposition, Magallenes said Avalos told him the Ford came into his lane but he was not sure if it was in front or the middle.

## III

## WILLFUL SUPPRESSION INSTRUCTION (CACI No. 204)

Oakhurst first contends that the jury was improperly instructed with CACI 204 involving willful suppression of evidence as to four items: the black box device on the tractor-trailer; an accident report prepared by Avalos; driving logs prepared by the co-driver Magallenes; and a drug and alcohol test taken by Avalos after the accident.

---

[4] Magallenes had testified previously he did not use Avalos's phone that day.

15

A. *Additional Factual Background*

Here, after the trial in this matter, the jury was instructed with CACI No. 203 as follows: "You may consider the ability of each party to provide evidence. If a party provided weaker evidence when it could have provided stronger evidence, you may distrust the weaker evidence." It also was instructed, without limitation, with CACI 204 as follows: "You may consider whether one party intentionally concealed or destroyed evidence. If you decide that a party did so, you may decide that the evidence would have been unfavorable to that party." The relevant facts pertaining to these instructions are as follows:

1. *MIL – black box*

Oakhurst filed its MIL 6 which addressed the exclusion of any reference to a data recorder or "black box" on the tractor-trailer. Oakhurst contended that there was conflicting evidence as to whether or not a black box recording device was on the tractor-trailer at the time of the accident. Moreover, whether the device was present or absent, neither party knew what data it recorded. Further, none of the parties alleged that it recorded what lane the impact occurred, which was the source of liability in the instant case. Oakhurst contended that at the time of the accident, the CHP officers, the Johnsons and Oakhurst did not know if the black box existed.

The Johnsons filed a reply. They claimed that Oakhurst had failed to preserve the black boxes. As evidence, they presented discovery conducted in 2007. In 2007, an interrogatory was sent by the Johnsons to Oakhurst asking for, "Any and all records generated through the use of the QUALCOMM OMNITRAX system with which the

16

truck may or may not have been equipped at the time of the INCIDENT . . ." In response, Oakhurst stated, "Responding party is not aware [i]f such a system was equipped on the subject vehicle, therefore, is unable to comply with this request." The Johnsons also provided the deposition testimony of Phillips. In his deposition, he was asked, "Describe the onboard data collection system this vehicle had, first of all again. Is this the Qualcomm that you are talking about?" Phillips responded, "No. Well, yes and no." Phillips recounted that, based on his research, that this type of vehicle had a Detroit diesel engine with a recording device, e.g. the black box. It would record hard braking. When asked if he reviewed the data from the tractor-trailer, he stated, "Well, the short answer is no. But I wasn't involved until two years later, and nobody apparently understood that it had this capability, at least to my knowledge." Phillips had asked prior counsel about a black box and no one was aware of what Phillips was talking about. Further, the "trucking" company stated that the tractor-trailer also had a Teletrac system. In response to discovery, Oakhurst stated, "Responding party believes that at the time of the incident the recording system that was in use and still in use is Teletrac and the requested information had been purged from the system six (6) months after the incident." In addition, there was a request for, "Any all records generated by on-board recording devices with which the truck was equipped at the time of the INCIDENT . . . "

Oakhurst filed a reply. Oakhurst responded it did not have the black box data in its control or custody. Further, the new expert hired by the Johnsons, Bellino, did not have any information that the tractor-trailer in question had the black box. Further, they argued that instruction pursuant to CACI No. 204 was improper because there was no

17

evidence that Oakhurst intentionally withheld evidence as there was no definitive evidence a black box existed on the tractor-trailer or was destroyed.

On September 12, 2011, the trial court heard argument on Oakhurst's MIL 6. The trial court inquired of the black box that was not part of the first trial. Oakhurst represented that it rented the truck from Penske and Ryder. The trial court understood from *other cases* that the black boxes could tell speed and braking. The Johnsons advised the trial court that Oakhurst admitted through its expert (Phillips) that there were two recording devices on the tractor-trailer. Oakhurst denied the expert ever saw the tractor-trailer or knew about the devices. The trial court held off ruling on the black box until Phillips testified. The Johnsons also offered that they would present testimony through their expert Bellino that the black box was purged by Oakhurst.

Later, the Johnsons mentioned that based on the response to an interrogatory, Oakhurst agreed that there was a black box and it had been purged. Oakhurst argued it was Teletrac that was not a black box; Teletrac only was a tracking device for drivers. The discovery responses only referred to the Teletrac and had nothing to do with a black box or any other onboard device. Phillips did not inspect the tractor-trailer involved to see if there was a black box that tracked speed or anything else; he could not know. The Johnsons argued that Oakhurst lied to the expert; the black box existed and was purged. The trial court stated it was going to conduct an Evidence Code section 402 hearing on the matter of the black boxes and decide if it should be admitted. No such hearing was conducted.

Rafferty testified he was not aware of a black box on the involved tractor-trailer. He also testified that Teletrac, which was located in Orange County, destroyed any data that would have been on their system after six months. Rafferty explained that the Teletrac system only recorded where the vehicle was parked and its location. Phillips testified as provided, *ante*, that a black box would have recorded speed and braking. Bellino testified he was unaware of any black box on the tractor-trailer and it would not provide the point of impact.

At the time the parties discussed the instructions, Oakhurst argued that there had been no willful suppression of the black boxes or anything else in the case. The trial court responded, "Listen to me very carefully. I just read that instruction entirely so that you can listen to it. If you decide that a party did so. In other words, it's a jury question then you treat it in a certain way. If they decide no, then they don't apply anything to it." Oakhurst's counsel responded that he was concerned about the part of the instruction that if they did find there was willful suppression, "you may decide that the evidence would have been unfavorable to that party."

Oakhurst complained that the issue was where the collision occurred. The black box would not have given that information. The trial court interrupted and stated it would have given the speed. Oakhurst's counsel stated that there was only a five mile per hour disparity on the vehicles. The trial court responded, "That's what they say. I don't know the answer to it. The thing would have said much more than that, I don't know that. I'm going [to] give it over your objections."

19

During opening argument, the Johnsons argued that the tractor-trailer had two data recording devices that were purged. They argued that one of the devices recorded speed and braking. The Johnsons argued, "All that information was captured by the electronic device, the one in the engine and the one in the cab. Both those were purged by Oakhurst. They were erased. Both of the computer brains were erased."

During closing argument, the Johnsons raised that Oakhurst failed to preserve the data recorders. Oakhurst should have known based on the severity of the accident that they should have saved the evidence. The Johnsons argued, "If it helps you, you would preserve it. If it doesn't, you would purge it is what I suggest occurred here. And they did exactly that. They didn't keep the accident report on the investigation. They didn't keep the data from the computer . . . ."

Oakhurst responded by asking the jury to focus on the accident itself and ignore any of the arguments about anything else that the Johnsons were trying to make to distract them from the real issues in the case.

The Johnson's rebuttal included an argument that Oakhurst did not save their driving logs or data recorders because the evidence would not help them. The Johnsons argued, "[t]hey don't have it because the evidence would have been unfavorable to them."

## 2. *Drug and alcohol tests and accident report kit*

Oakhurst's MIL 5 sought to exclude evidence that they failed to conduct their own investigation of the accident. In response, the Johnsons alleged that Avalos had failed to prepare an accident report kit in violation of its own policies regarding safety and accident investigation. The Johnsons attached Avalos's testimony from the first trial. In that testimony, Avalos was shown the fleet safety manual that was promulgated in 2006. Avalos read from the manual that he was to submit an accident report kit. Avalos did not remember if he completed one. An objection was made that the manual was from 2006, when Avalos was no longer employed at Oakhurst, but it was overruled. The Johnsons also presented discovery responses that they asked Oakhurst for all safety manuals and they were given the 2006 version. Avalos's personnel file was also turned over.

Oakhurst responded that whether Avalos completed an accident report kit or not was irrelevant to causation. Further, the best evidence was the CHP investigation. Oakhurst later argued that the 2006 policies and procedures were not relevant to causation.

In Oakhurst's MIL 9, they sought to exclude any mention of a lack of drug and alcohol testing of Avalos. Avalos was not suspected at the accident scene to be under the influence of drugs or alcohol. Any mention that he did not take a drug or alcohol test would be prejudicial. The Johnsons did not file a written reply.

Prior to trial, the parties discussed the fleet safety manuals. The trial court noted that part of the handbook was that employees were not to use their cellular telephones while they were driving. Avalos lied and said he was not on his phone.

21

Oakhurst argued the handbook was written in 2006 and the accident was in 2003. The Johnsons responded it was the only manual they had been given in discovery. The trial court felt the 2006 manual was admissible because Avalos had previously testified he broke rules in the manual and no other manual had been produced.

The trial court later revisited the issue. Oakhurst's counsel represented that in 2007, during discovery, they produced the two-page safety manual that was effective in 2000 that would have been in place when the accident occurred in 2003. In the 2000 manual, there was no mention of cellular telephone use. Avalos signed the 2000 version.

The Johnsons argued that Oakhurst had represented that the manual from 2006 was the one in effect during the first trial. Avalos agreed he violated the manual. The trial court allowed the 2000 manual to be admitted into evidence and Oakhurst could argue it was applicable at the time of the accident.

The 2000 manual was admitted during Rafferty's testimony. According to the two-page safety manual in effect in 2000, there was no requirement of a drug or alcohol test after an accident or to complete an accident report kit.

The Johnsons argued during opening argument that Avalos had refused to take a drug and alcohol test and Avalos did not complete an accident report kit.

During argument, the Johnsons argued that Avalos was fatigued and on a long trip. They argued that driving while talking on a cellular telephone was a careless act and Avalos had lied about using the phone. He was on the phone while he was supposed to be sleeping. They also argued he violated the fleet safety manual by using his phone, by failing to take a drug and alcohol test and by failing to prepare an accident report kit.

22

They later again argued that Oakhurst suppressed the accident report and failed to preserve the black boxes.

The Johnsons argued, "Preserve your record. If it helps you, you would preserve it. If it doesn't, you would purge it is what I suggest occurred here. And they did exactly that. They didn't keep the accident report on the investigation. They didn't keep the data from the computer and the drug and alcohol test. Maybe they did do exactly what their company rules say, 32 hours later do a drug test. And maybe those drug tests weren't so helpful to them and that's why they are not here for us to see. That's something for you to consider." The Johnsons also argued, "So when you think about this willful suppression, please consider those facts that they had the ability to give us the drug tests, the accident report kit, Magallenes's logs, but they refused. They didn't. They just didn't. An important thing is you may very-well conclude that they didn't because it was unfavorable to them, and I think that's how the evidence is pointing at this juncture."

3. *Magallenes's log*

The evidence regarding driving logs prepared by Magallenes was scarce. Rafferty testified that Avalos kept a driving log and that it was kept in the employment records. Avalos testified that Magallenes would have kept his own driving log. Magallenes testified he kept a logbook of his driving, that he kept it for a month and then threw it away in accordance with his normal practice. He showed them to a CHP officer at the scene. Magallenes stated he gave a copy of the driving logs to Oakhurst and he had no idea how long they kept them.

23

The Johnsons argued during closing that Oakhurst should have produced the Magallenes's logs. Further, as stated above, they argued that the failure to do so was unfavorable to them.

### 4. *Jury deliberations*

During deliberations, the jury sent out a note that they wanted to know the time limit for deliberations if they were "stuck." The jury was called into the courtroom and the foreperson indicated the split of the vote was 8 to 4. They were advised they should keep deliberating. They retired for deliberations and then reached a verdict. The final verdict was a 10 to 2 vote.

### 5. *Motion for new trial*

Oakhurst filed a motion for new trial as to the liability phase of the trial. Oakhurst first raised that the trial court erroneously instructed the jury with CACI 204 on willful suppression of evidence. First, it raised the issue of the "black boxes" and that there was no evidence they even existed on the tractor-trailer or what they recorded. The only evidence was of Teletrac on the vehicle which would not have provided a specific location in the lane. Second, the accident report kit would not have been helpful as there was no evidence that Avalos would have provided more than what the numerous CHP officers at the scene provided. Third, the lack of an alcohol or drug test issue was raised. There was no suspicion that Avalos was under the influence. Moreover, no test was suppressed. Finally, there was no evidence in the case about the driving logs of Magallenes. There was no evidence they existed and no evidence how they would help

24

in deciding liability.  There was no evidence that Oakhurst willfully suppressed these items.

Oakhurst argued it was prejudicial because the Johnsons argued to the jury that the items had been kept from the jury because they were harmful to Oakhurst.  Oakhurst provided juror declarations that the instruction caused a "shift" in support for four jurors.  The declarations only showed observable facts and not the thought processes of the jurors.

According to the declarations, the initial vote was eight jurors favored Oakhurst and four jurors favored the Johnsons.  One juror, Huerta, had the presiding juror read CACI 204 to the jury.  After this instruction was given, another poll was taken and three jurors favored Oakhurst and nine found in favor of the Johnsons.

The Johnsons filed opposition to Oakhurst's motion for new trial.  The Johnsons argued that Oakhurst had not shown a miscarriage of justice had occurred.  They argued that Avalos was aware he had been in a serious accident.  Written policies of Oakhurst mandated that he prepare an accident report and take a drug and alcohol test.  There were no driving records for Magellenes and no black boxes.  Since they were mandated by Oakhurst's own policies, they would have produced evidence relevant to the liability of Oakhurst.

Oakhurst filed a reply.  The Johnsons could not provide juror declarations to contradict Oakhurst's declarations.  Further, there was no evidence of willful suppression of evidence.  No evidence the items would have an impact on the case.

The matter was heard on March 1, 2012.  The trial court first went over the issues that were being raised.  As for the juror declarations, it noted that it was going to exclude them pursuant to Evidence Code section 1150.[5]  The trial court stated, "[w]hether I did or did not, even if I should consider it, I come up with the same result because it's based upon the idea that I made a legal decision that was incorrect, i.e., to give CACI instruction 204, i.e. willful suppression of the evidence.  Since I don't believe that that was a wrong legal type of maneuver on this Court's part, I just don't see why I should, even if I should not exclude it, this Court consider it.  It doesn't make any difference as far as I'm concerned.  But legally speaking, I made a ruling that 1150 does apply."  The trial court tentatively stated it was going to deny the motion for new trial.

Oakhurst's counsel disagreed that the declarations went to the thought processes of the jurors.  Oakhurst argued there was no evidence that three of the items said to be willfully suppressed — the black boxes, accident report kit, and drug and alcohol test — even existed.  The instruction, according to Oakhurst, allowed the Johnsons to "substitute scandalous speculation that was connected to nothing in the place of evidence."  Oakhurst argued CACI 203 was the correct instruction.  Oakhurst argued that it was a very close case on liability and this had an impact on the verdict.

---

[5]     Evidence Code section 1150 provides as follows:  "(a)  Upon an inquiry as to the validity of the verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly.  No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

On March 6, 2012, the notice of ruling denying the motion for new trial was entered.

B.  *Standard of Review*

We apply the de novo standard of review to this claim.  (See *Sander/Moses Productions, Inc. v. NBC Studios, Inc.* (2006) 142 Cal.App.4th 1086, 1094-1095 ["Challenges to jury instructions are subject to a de novo standard of review"].)

C.  *Evidence of Actual Suppression*

"'[A] party is entitled to have the jury instructed on his theory of the case, if it is reasonable and finds support in the pleadings and evidence or any inference which may properly be drawn from the evidence.'  [Citation.]"  (*Moore v. Preventive Medicine Medical Group, Inc.* (1986) 178 Cal.App.3d 728, 744.)

Evidence Code section 413 provides that, "[i]n determining what inferences to draw from the evidence or facts in the case against a party, the trier of fact may consider, among other things, the party's . . . wilful [sic] suppression of evidence relating thereto. . ."  (*Shapiro v. Equitable Life Assurance Soc.* (1946) 76 Cal.App.2d 75, 94, italics omitted.)  The rule expressed in Evidence Code section 413 "'is predicated on common sense, and public policy.  The purpose of a trial is to arrive at the true facts.  A trial is not a game where one counsel safely may sit back and refuse to produce evidence where in the nature of things his client is the only source from which that evidence may be secured.  A defendant is not under a duty to produce testimony adverse to himself, but if he fails to produce evidence that would naturally have been produced he must take the risk that the trier of fact will infer, and properly so, that the evidence, had it been

27

produced, would have been adverse.'  [Citation.]"  (*Williamson v. Superior Court* (1978) 21 Cal.3d 829, 835, fn. 2, italics omitted.)  CACI No. 204 is derived from Evidence Code section 413.

"The substantial evidence test applies to jury instructions as well as judgment [citation], and it is prejudicial error to instruct the jury on wilful [sic] suppression of evidence when there is no evidence to support the instruction."  [Citation.]"  (*Bihun v. AT&T Information Systems, Inc.* (1993) 13 Cal.App.4th 976, 992 (*Bihun*), disapproved of on other grounds in *Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644.)

In *Bihun*, an employee sued her former employer for damages arising from sexual harassment, after she was subjected to unwelcome sexual advances by one of the employer's senior officials.  (*Id.*  at pp. 985-986.)  On appeal, the employer claimed that the trial court erred by instructing the jury on willful suppression of evidence after the employer's attorney failed to admit in a request for production of documents that the senior official's personnel file could not be located.  (*Id.* at pp. 991-992.)  The court first noted that "a wilful [sic] suppression instruction does not require direct evidence of fraud."  (*Id.* at p. 992.)  It also noted, "[i]n our case the defendant not only was unable to produce records it clearly could anticipate would be requested after it was sued, when those records were requested it covered up the fact the records had been lost or destroyed and did not reveal this fact until forced to do so in the middle of trial."  (*Id.* at pp. 993-994.)  The court found evidence supported the willful suppression of evidence including that although the senior official's employment file could not be found, the employee's file could be found; the defendant covered up the loss of the file; defendant's own rules

28

required that the personnel file be maintained if a matter is in litigation; and "it was reasonably probable" performance evaluations and other documents or the employee's complaints of sexual harassment would have been in the file. (*Id*. at p. 994.)

In *Cedars–Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, the court held that there is no tort remedy for the intentional destruction of evidence by a litigating party. (*Id.* at p. 17.) *Cedars–Sinai* expressed a preference for remedying litigation-related misconduct by imposing sanctions in the underlying lawsuit rather than by creating a tort remedy. (*Id.* at pp. 8-9.)

*Cedars–Sinai* also stated that other, nontort remedies available for intentional spoliation, including particularly the evidentiary inference provided by Evidence Code section 413 and discovery sanctions under former section 2023, were sufficient to deter intentional spoliation and protect the spoliation victim. (*Cedars–Sinai, supra*, at pp. 11-13.) *Cedars–Sinai* also stated that uncertainty as to what the spoliated evidence would have shown created a risk that the spoliator could be found liable for damages even if the spoliated evidence would not have changed the outcome of the underlying litigation. (*Id.* at p. 15.) *Cedars–Sinai* also expressed concern about the cost of litigating meritless spoliation claims where evidence was destroyed, not for the purpose of making it unavailable in litigation, but innocently in the ordinary course of business. (*Id.* at pp. 15-16.)

A later case addressing *Cedars-Sinai* stated, "Moreover, we believe that the concern expressed in *Cedars–Sinai, supra,* 18 Cal.4th at pages 15-16, [], about meritless spoliation claims where the evidence was destroyed innocently in the ordinary course of

29

business is an appropriate concern in this context as well. A party moving for discovery sanctions based on the intentional destruction of evidence could argue that the mere fact that the evidence no longer exists supports an inference of intentional spoliation. Rather than decide the facts with respect to the intentional destruction of evidence and impose a nonmonetary sanction on a pretrial motion in circumstances not contemplated by the discovery statutes, we believe that in most cases of purported spoliation the facts should be decided and any appropriate inference should be made by the trier of fact after a full hearing at trial." (*New Albertsons, Inc. v. Superior Court* (2008) 168 Cal.App.4th 1403, 1431, footnote omitted.)

Here, the evidence of willful suppression of the Teletrac or black box was deficient. Initially, it is clear from the interrogatories and testimony from Rafferty that no one at Oakhurst was aware of a black box on the tractor-trailer. They were completely unaware of the system and no evidence was presented that they were lying. It was not until 2011 that Phillips discovered that this type of truck had a black box system. Phillips was advised by the prior attorneys that no one knew about it.

The trial court never made a determination that Oakhurst was aware of the device and intentionally suppressed it. It never determined if it ever existed. Based on the statements made by the trial court, it appeared to leave the determination to the jury. However, there must be some evidence to support the willful suppression instruction. (*Bihun, supra,* 13 Cal.App.4th at p. 992.) Based on the record in this case, there simply was no sufficient evidence that Oakhurst had any control over the black box, if it even was installed on this tractor-trailer, or that it was intentionally destroyed by Oakhurst.

30

Moreover, it appears, like the Teletrac data, to have been purged in the normal course of business. Further, as for Teletrac information, which only described the location of the vehicle, Oakhurst could not be expected to determine it would be relevant and should be preserved should litigation on an accident occur. Moreover, it was purged in the normal course of business and would not change the outcome of the litigation. (*Cedars-Sinai, supra,* 18 Cal.4th at p. 16.) The willful suppression instruction was not supported by evidence that a black box may have been destroyed and certainly did not support the inference that it was favorable evidence for the Johnsons.

Additionally, it is undisputed that Avalos did not submit to an alcohol and drug test after the accident, and that he did not complete an accident report kit. Hence, as argued by Oakhurst, there was no evidence that Oakhurst suppressed any evidence. Giving the instruction that allowed the Johnsons to argue that there was intentional suppression of evidence that did not exist was error. The only support for the instruction would have been if Avalos was required, as argued by the Johnsons, by his company policy to prepare this documentation and he purposefully refused to comply. (*Bihun, supra,* 13 Cal.App.4th at pp. 992-994.)

The Johnsons have argued that Avalos had an obligation to prepare both the accident report kit and take a drug and alcohol test based on the fleet safety manual. They refer to the manual dated September 11, 2006.[6] The fleet safety manual to which

---

[6] We note that Oakhurst has failed to raise the argument in either its opening brief or reply brief that the 2000 fleet safety manual did not require an alcohol and drug test or accident report. Rather, Oakhurst states the items supposedly suppressed by it did

*[footnote continued on next page]*

the Johnsons rely upon was not enacted until 2006, three years after the accident. The

Johnsons cannot claim that such a requirement existed based on the 2006 manual.[7]

Rather, the fleet safety manual from 2000, that Avalos signed, and the trial court admitted

into evidence, had no requirement for a drug or alcohol test or for the preparation of an

accident report kit. Rafferty testified that he produced the personnel file of Avalos and it

included the 2000 manual signed by Avalos. It is inconceivable how Oakhurst could

have been found by the trial court to have willfully suppressed evidence on a theory that

Avalos purposefully failed to produce it when Avalos had no requirement to complete it

based on the manual in effect at the time of the accident.

We have reviewed both safety manuals. It is clear that the 2006 manual was not

promulgated until 2006, well after the accident in this case. The fleet safety manual in

place was created in 2000, and makes no mention of the accident report kit or a drug or

---

*[footnote continued from previous page]*

not exist. We consider this issue because the only argument raised by the Johnsons that it was required is that the 2006 safety manual required it.

[7] At oral argument, the Johnsons raised for the first time that the 2006 manual included language that it superseded rules enacted in 1999 regarding the drug and alcohol testing requirements at Oakhurst. We have found no such reference in the record. No such requirement was included in the 2000 rules signed by Avalos and there was no evidence presented in the trial court, or in this court, regarding rules promulgated in 1999. The Johnsons have also referred to Rafferty's testimony at oral argument and in their respondent's brief as establishing a requirement at Oakhurst that a driver who is involved in an accident must submit to drug and alcohol testing with 32 hours of the accident. They contended in the respondent's brief that such rule was required by the 2006 manual, which we have already concluded was not in place when the accident occurred. There simply was no credible evidence of a drug and alcohol testing requirement in 2003 when the accident occurred to warrant the willful suppression instruction.

alcohol test. As such, the willful suppression instruction was not supported by evidence that Oakhurst suppressed an alcohol and drug test or an accident report kit.

Finally, as to the driving logs of Magallenes, there simply is not enough evidence in the record in order to determine what happened to the logs. Magallenes testified he prepared them but had no idea what Oakhurst did with the logs. There is no evidence if the logs were destroyed in the normal course of business or if they still existed. This did not support the instruction.

None of the four pieces of evidence supported the willful suppression instruction.

D. *Prejudice*

Oakhurst contends that if the instruction was erroneously given, that prejudice need not be shown and reversal is mandated without consideration of prejudice. The Johnsons respond that prejudice must be shown.

In *Bihun*, the court stated, without further analysis, that "it is prejudicial error to instruct the jury on wilful [sic] suppression of evidence when there is no evidence to support the instruction." (*Bihun, supra,* 13 Cal.App.4th at p. 992.) In *County of Contra Costa v. Nulty* (1965) 237 Cal.App.2d 593, it held that it is prejudicial error to give an instruction on fraudulent suppression of evidence when there is no showing of fraudulent suppression. (*Id.* at p. 598.) However, after these cases were decided, in *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, the California Supreme Court held, "We . . . conclude that there is no rule of automatic reversal or 'inherent' prejudice applicable to any category of civil instructional error, whether of commission or omission. A judgment may not be reversed for instructional error in a civil case 'unless, after an

33

examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' [Citation.]" (*Id.* at p. 580.) The California Supreme Court has further explained, instructional error requires reversal only "'"where it seems probable" that the error "prejudicially affected the verdict"'" [Citation.] The reviewing court should consider not only the nature of the error, "including its natural and probable effect on a party's ability to place his full case before the jury," but the likelihood of actual prejudice as reflected in the individual trial record, taking into account "(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." [Citation.]" (*Rutherford v. Owens–Illinois, Inc.* (1997) 16 Cal.4th 953, 983 (*Rutherford*).)

We conclude the instruction was prejudicial after reviewing the entire cause. The case for liability in this case was not strong. Avalos, the only witness who saw the impact, testified that Debra veered into his truck and hit him. There were no skid marks or any type of evidence in Avalos's lane. The skid marks did not establish the point of impact. The Johnsons' expert relied on the skid marks and reconstruction, but also relied heavily on Avalos's failure to take a drug test, his fatigue, and his failure to make an accident report in concluding that Avalos was at fault. Oakhurst had an equally credible expert, who surmised based on the same markings on the road, that Debra hit the trailer.

Hence, in this case, any advantage for either party could conceivably sway the jury. The Johnsons argued that Avalos was fatigued because it was clear he drove the entire route. They were then able to argue that Magallenes's logs were destroyed to hide

34

this fact. They were able to argue that it was suspicious that Avalos did not complete an accident report kit despite the fact there were statements by Avalos as to the accident cause and voluminous police reports. Further, the Johnsons were able to argue that Oakhurst destroyed the black boxes because it had damaging information. Also, they were able to argue that Avalos was on drugs at the time of the accident which caused him to veer into Debra's lane. It "'"seems probable" that the error "prejudicially affected the verdict.'" [Citation.] (*Rutherford, supra,* 16 Cal.4th at p. 983.)

Moreover, there is a strong indication from "the jury itself that it was misled." [Citation.]" (*Rutherford, supra*, 16 Cal.4th at p. 983.) The trial court excluded the declarations provided by Oakhurst.

The California Supreme Court has "emphasize[d] that, when considering evidence regarding the jurors' deliberations, a trial court must take great care not to overstep the boundaries set forth in Evidence Code section 1150. The statute may be violated not only by the admission of jurors' testimony describing their own mental processes, but also by permitting testimony concerning statements made by jurors in the course of their deliberations." (*People v. Hedgecock* (1990) 51 Cal.3d 395, 418-419.) "'"[A] verdict may not be impeached by inquiry into the juror's mental or subjective reasoning processes, and evidence of what the juror 'felt' or how he understood the trial court's instructions is not competent."' [Citations.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 53.)

However, "[J]urors may testify to 'overt acts' — that is, such statements, conduct, conditions, or events as are 'open to sight, hearing, and the other senses and thus subject

35

to corroboration'— but may not testify to 'the subjective reasoning processes of the individual juror . . . .' [Citation.]" (*In re Stankewitz* (1985) 40 Cal.3d 391, 398.) Although overt acts may be admitted, statements must be received with caution. "Statements have a greater tendency than nonverbal acts to implicate the reasoning processes of jurors — e.g., what the juror making the statement meant and what the juror hearing it understood. They are therefore more apt to be misused by counsel in an effort to improperly open such processes to scrutiny." (*Ibid.*)

Here, the trial court properly determined that it could not consider the thought processes of the jurors under Evidence Code section 1150. However, the trial court could consider the votes of the jurors (which were stated in open court) and that, between the time of the first vote and the finding of liability, that the willful suppression instruction was given in the jury room. It is reasonably inferred that the instruction had some impact on the jurors. Nonetheless, the prejudice was apparent even without considering the declarations.

Based on the foregoing, instruction to the jury with CACI No. 204 was prejudicial. We reverse liability and damages. We briefly address two of the other issues raised by Oakhurst as to the liability phase in anticipation of a third trial in this matter.

IV

REMAINING ISSUES

Oakhurst contends that the trial court should have admitted the opinions of the CHP officers at the scene as to the point of impact especially in light of allowing Officer Kaplan to testify regarding the alignment of the Ford. Oakhurst further contends that the

36

trial court erred by admitting a response to a Request for Admission wherein Avalos denied he was using his cellular telephone during the accident.

A. *Request for Admission*

Prior to trial, a Request for Admission provided to Avalos stated as follows: "Admit that YOU were using a cellular phone at the time of the INCIDENT." Avalos responded, "Deny." The Request for Admission and response were admitted during Avalos's testimony.

The trial court found the Request for Admission admissible as it went to Avalos's credibility. The denial was admissible under Evidence Code section 780. Evidence Code section 780 provides that "Except as otherwise provided by statute, the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including but not limited to any of the following: [¶] (h) A statement made by him that is inconsistent with any part of his testimony at the hearing." Oakhurst provided no persuasive authority that this was not applicable to the Request for Admission.

B. *Testimony by CHP Officers*

Prior to trial, the trial court excluded the testimony of CHP Officers Forbes and Briggs as to the cause of the accident. Initially, the trial court noted that all of the CHP Officer witnesses could not testify as to causation because it would be cumulative. The trial court found that the TCR was not admissible. The trial court noted that any measurements or tire marks were admissible but the report itself was not admissible. The trial court stated that there was no physical evidence of the point of impact. Oakhurst

37

argued that the officer who looked at the markings would testify that the point of impact was consistent with Avalos's statement and the physical evidence.  The trial court responded, "You're not going to get there, I can tell you that right now."  The trial court excluded any opinions by the officers on the point of impact.  The trial court did note that if the officers qualified as reconstruction experts they could testify about their opinion as to the point of impact.

In Officer Forbes's testimony, he stated that he had taken several traffic accident investigation classes but provided nothing about accident reconstruction.  Officer Briggs stated he was not qualified in accident reconstruction; he only was trained to mark evidence.

Expert opinion testimony is admissible when it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid.Code, § 801, subd. (a).)  "[T]he determinative issue in each case must be whether the witness has sufficient skill or experience in the field so that his testimony would be likely to assist the jury in the search for the truth, and 'no hard and fast rule can be laid down which would be applicable in every circumstance.'  [Citation.]  Where a witness has disclosed sufficient knowledge, the question of the degree of knowledge goes more to the weight of the evidence than its admissibility." (*Mann v. Cracchiolo* (1985) 38 Cal.3d 18, 38.)

Here, Officers Briggs and Forbes were never qualified as experts in accident reconstruction.  Presuming Oakhurst could establish in another trial that Officers Briggs and Forbes did in fact have the necessary expertise in accident reconstruction, their

38

opinions based on Avalos's statements and the surrounding evidence would be admissible. (Evidence Code, § 801, subd. (b).)

Officer Kaplan, who testified he had extensive experience in the mechanical workings of cars, and was an expert as conceded by Oakhurst, testified as set forth, *ante*, that based on his review of the alignment on the Ford, it would not have caused the Ford necessarily to veer to the right. Officer Kaplan did not testify as to the cause of the accident. He provided that based on his review of the alignment, it would not have veered to the right. Such expert opinion, based on his experience as a mechanic, was properly admitted.

V

DISPOSITION

We reverse the judgment. Oakhurst is awarded its costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI
                                                                                  J.

We concur:

RAMIREZ
            P. J.

McKINSTER
            J.