[No. B181928. Second Dist., Div. Five. Sept. 11, 2006.]

SANDER/MOSES PRODUCTIONS, INC., Plaintiff and Appellant, v. NBC STUDIOS, INC., Defendant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part III., sections B., C., D., E. and F.

## COUNSEL

Rintala, Smoot, Jaenicke & Rees, Peter C. Smoot, J. Larson Jaenicke and Michael B. Garfinkel for Plaintiff and Appellant.

Irell & Manella, Henry Shields, Jr., Laura A. Seigle and Anne Hwang for Defendant and Respondent.

## OPINION

MOSK, J.—

## I. INTRODUCTION

Plaintiff and appellant Sander/Moses Productions, Inc. (Sander/Moses) contracted with NBC Studios, Inc. (NBC Studios) to provide executive production services for the television series entitled *Profiler*, which the NBC television network broadcast between 1996 and 2000. Sander/Moses provided those services for two years and was paid the fixed compensation to which it was entitled under the agreement. A dispute arose over Sander/Moses's entitlement to contingent compensation under the agreement. Sander/Moses sued, alleging that NBC Studios wrongly applied a contract limitation provision to calculate the contingent compensation owed Sander/Moses under the agreement. The trial court granted NBC Studios's motion for summary adjudication as to the breach of fiduciary duty cause of action and its motion for judgment on the pleadings as to the cause of action for breach of the implied covenant of good faith and fair dealing. A jury subsequently returned a verdict in favor of NBC Studios on the remaining causes of action.

Sander/Moses appeals the judgment entered after the verdict on various grounds. In the published portion of the opinion, we discuss Sander/Moses's contentions that the trial court erred by not shifting the burden of proof to NBC Studios. We hold that the trial court correctly instructed the jury on the burden of proof.

## II. FACTUAL AND PROCEDURAL BACKGROUND

A. *The Agreement Between NBC Studios and Sander/Moses for the Services of Sander and Moses As Executive Producers of the Profiler Series*

In 1996, NBC Studios was a production company that produced television programs and sold them to the NBC television network, among others. The network paid NBC Studios a licensing fee for the right to broadcast the programs NBC Studios developed.

Ian Sander (Sander) and Kim Moses (Moses) were experienced executive producers.[1] They were the principals in Sander/Moses, a loan-out company that made the executive production services of Sander and Moses available to production companies.

In 1996, NBC Studios purchased a script for a television pilot entitled *Insight* from its author, Cynthia Saunders. NBC Studios renamed the pilot *Profiler*. At the time NBC Studios acquired the rights to *Profiler*, the NBC television network was planning a Saturday night program lineup of "spooky" programs that the network referred to as "thrillogy night." The NBC television network had expressed an interest in airing *Profiler* as part of thrillogy night, along with two other new one-hour programs entitled *The Pretender* and *Dark Skies*.

NBC Studios began searching for an executive producer for the *Profiler* pilot and ultimately entered into negotiations with Sander/Moses for the services of Sander and Moses as executive producers for the *Profiler* pilot and proposed series. NBC Studios expected Sander and Moses to render the types of services customarily rendered by executive producers in the television industry. An experienced entertainment attorney and an agent from Creative Artists Agency (CAA) represented Sander/Moses in the negotiations, and NBC Studios was represented by an in-house attorney from its business affairs department.

---

[1] Production companies such as NBC Studios hire executive producers to manage the day-to-day production of television programs.

On February 29, 1996, Sander/Moses entered into an agreement with NBC Studios with respect to production of a one-hour pilot script for *Profiler* and a proposed one-hour series based on the pilot. The agreement provided that if the pilot was produced, NBC Studios would pay Sander/Moses $95,000 and would engage Sander and Moses as the executive producers for the first year at $37,500 per episode. The agreement also gave NBC Studios an option to retain the services of Sander and Moses for the second and third years of production at $40,000 and $45,000 per episode, respectively. In addition, the agreement provided that if NBC Studios retained Sander and Moses for the second year of the series, but did not retain them as executive producers for the third year, they would be engaged as executive consultants for the third year at $20,000 per episode.

In addition to the fixed compensation, the agreement specified that Sander/Moses was entitled to contingent compensation. For executive producing the pilot, Sander/Moses was to receive 2.5 percent of NBC Studios's "adjusted gross" from the series. Sander/Moses was also entitled to an additional 2.5 percent of the "adjusted gross" for executive producing the first year of the series and another such 2.5 percent for executive producing the second year of the series.

The term "adjusted gross" was defined in appendix I[2] to the agreement as the amount of "gross receipts" that remained after certain deductions, such as distribution expenses. The term "gross receipts" had a traditional definition in the appendix, but then was further defined to be the same as the license fees that the NBC television network paid to NBC Studios for the rights to broadcast *Profiler.* The provision equating gross receipts to license fees further required NBC Studios to use "[a]n amount equal to ninety-five percent (95%) of the published final pattern budget[3] for the applicable broadcast year approved by [NBC Studios] for programs produced for the first four (4) full broadcast years" (Budget Formula) for purposes of calculating gross receipts for the first three years of the series. That Budget Formula, however, was subject to an overriding limitation: "[P]rovided, however, that the total license fee . . . shall in no event exceed the license fee . . . paid by

---

[2] According to the attorney who negotiated the agreement on behalf of NBC Studios, appendix I was based on a form that had been developed through prior negotiations between other CAA agents and NBC Studios. The compensation scheme described in appendix I was the "top" definition of adjusted gross that NBC Studios had negotiated in the past with CAA agents, i.e., it had the most favorable terms of the agreements negotiated between NBC Studios and CAA on behalf of its other clients.

[3] The "published final pattern budget" is the budget for each episode of the program that is approved by NBC Studios and the NBC television network before shooting commences. The final pattern budget per episode for *Profiler* for the first season was $1,336,182.

[the] NBC [television network] during the applicable broadcast year to suppliers of programs comparable to the Program [*Profiler*] in a similar broadcast year . . . ."[4] The "programs comparable" limitation did not apply to the fourth year of the series.

Under the agreement, NBC Studios retained all ownership rights to *Profiler*, including any copyrights.[5] NBC Studios also controlled the production, distribution, and exploitation of *Profiler*. It had the right to make the "final and controlling" determination "in all matters respecting the performance of [Sander and Moses's] services (including without limitation matters involving creative judgment and financial controls)." The agreement further provided that "[NBC Studios] shall have no obligation to produce, complete, release, distribute, advertise, or exploit any television program or series . . ." and that "[n]othing contained in this Agreement shall constitute a partnership or joint venture by the parties hereto . . . ."

B. *The Parties' Performance Under the Agreement*

Sander and Moses provided executive production services for the *Profiler* pilot, which, in May of 1996, the NBC television network "picked up"—i.e.,

---

[4] The entire provision reads as follows: "Company [NBC Studios] and Participant [Sander/Moses] have agreed that for purposes of computing Gross Receipts arising out of Company's authorization of the broadcast of the Program [*Profiler*] over the facilities of the NBC television network ('NBC'), the network license agreement between NBC and Company with respect to such broadcast shall be deemed to provide for the payment by NBC to Company of the following applicable license fees, which license fees shall be deemed to be in lieu of all actual Gross Receipts, if any, accruing to Company from the authorization of such broadcast:

"(i) for the initial network broadcast by NBC of the Program, the following amounts: [¶] . . . [¶]

"(B) in the case of a series, an amount equal to ninety-five percent (95%) of the published final pattern budget for the applicable broadcast year [*sic*] approved by Company for Programs produced for the first four (4) full broadcast years (five (5) broadcast years if a Midseason broadcast start), and in the fifth (sixth if a Midseason start) and succeeding broadcast years, for programs produced subsequent to the first four (4) full broadcast years (five (5) broadcast years if a Midseason start), one hundred percent (100%) of the published final pattern budget, plus, in any event, such additional cast protection allowances or other 'breakage,' if any, which NBC shall pay Company in connection with the Program (the foregoing is not meant to guarantee that NBC shall agree to pay any such 'breakage' fees), provided, however, that the total license fee including 'breakage' shall in no event exceed the license fee including customary 'breakage,' if any, paid by NBC during the applicable broadcast year to suppliers of programs comparable to the Program [*Profiler*] in a similar broadcast year . . . ."

[5] Specifically, the agreement provided that "[a]ll results and proceeds of [Sander and Moses's] services under this Agreement shall be and become the property of [NBC Studios], and [NBC Studios] shall own all rights of every kind and character therein throughout the universe in any and all languages in perpetuity."

opted to have produced for exhibition or distribution—as a series for an initial season on the NBC television network. Pursuant to the agreement, they also provided executive production services for the first and second years of *Profiler*. The NBC television network broadcast *Profiler* on Saturday night, back-to-back with another thrillogy series, *The Pretender*.

Although *Profiler* was picked up by the NBC television network for a third season, NBC Studios did not retain Sander and Moses as executive producers that year. Instead, pursuant to the agreement, they were paid $20,000 per episode as executive consultants for the third season, but were not asked to perform any services. They did not perform any services or receive any compensation for the fourth and last season of *Profiler*. In total, NBC Studios paid Sander/Moses over $2,122,500 for Sander and Moses's work on *Profiler*.

## C. The Claim for Contingent Compensation

NBC Studios paid Sander/Moses all fixed sums due under the agreement for the pilot and the first, second, and third years of the series. The dispute centers on Sander/Moses's claim for contingent compensation under the agreement.

On June 7, 2000, Sander/Moses's attorney requested an accounting from NBC Studios. On August 15, 2000, NBC Studios provided an accounting showing adjusted gross receipts for *Profiler* through June 30, 2000. It listed Sander/Moses's "contingent compensation" at "$0." Thereafter, NBC Studios sent annual accountings to Sander/Moses on September 24, 2001, September 27, 2002, and October 9, 2003, each showing Sander/Moses's contingent compensation as "$0." Each statement calculated gross receipts for *Profiler* for the first three years[6] by adding up all the license fees NBC Studios received from the NBC television network for the right to broadcast the show.[7]

---

[6] Because the "programs comparable" limitation did not apply to Sander/Moses's entitlement to contingent compensation for the fourth year of the series, NBC Studios calculated the gross receipts for that year using the Budget Formula.

[7] NBC Studios's apparent rationale for simply using the *Profiler* license fee to calculate gross receipts for the first three years of the series, as opposed to the Budget Formula (limited by the "programs comparable" requirement), was as follows: Because *The Pretender* had a license fee that was almost identical to that for *Profiler*, and was otherwise comparable to *Profiler*, the license fees in the *Profiler* statements would be substantially similar to those in *The Pretender* statements; and, because the "programs comparable" limitation trumped the Budget Formula, using the *Profiler* license fee in the *Profiler* statements would yield the same or similar results as using the comparable statement for *The Pretender*.

In early 2002, Sander/Moses retained an accountant who sought an explanation from NBC Studios as to how the gross receipts shown in its annual accountings had been calculated. In response, NBC Studios informed the accountant that for the first three years of the series, it compared *Profiler* to *The Pretender* to determine the licensing fee. In addition, NBC Studios gave the accountant license fee information for several other shows. According to NBC Studios, any "gross receipts" amount would have to be limited by the license fee for *The Pretender*, which series NBC Studios considered "comparable" to *Profiler* under the agreement. This gross receipts figure was then reduced to zero by adjustments in the form of deductions for items such as distribution fees.

Sander/Moses contended, and it is undisputed, that if NBC Studios had used the Budget Formula for the first three years of the series,[8] the adjusted gross amount for *Profiler* would have been a positive $18,841,627 (as opposed to the approximately negative $25 million calculated by NBC Studios).[9] Sander/Moses maintained that *The Pretender* was not a comparable program under the agreement, and therefore there should have been no limitation on the Budget Formula. Because Sander/Moses was entitled to 7.5 percent of that positive amount, it contended its damages without interest were $1,413,122.

## D. *The Sander/Moses Lawsuit and the Jury Trial*

Sander/Moses filed an action against NBC Studios asserting causes of action for breach of fiduciary duty, breach of contract, breach of the implied covenant of good faith and fair dealing, accounting, and declaratory relief. The trial court granted NBC Studios's motion for summary adjudication as to the cause of action for breach of fiduciary duty and the request for punitive damages. It also granted NBC Studios's motion for judgment on the pleadings as to the cause of action for breach of the implied covenant of good faith and fair dealing.

The case proceeded to a jury trial in November 2004. During the arguments relating to jury instructions, Sander/Moses contended that the burden

---

[8] Sander/Moses's primary theory of recovery was that there were no programs comparable to *Profiler* during the years in question and, therefore, the "programs comparable" limitation in the Appendix I definition did not apply. Ninety-five percent of the *Profiler* final pattern budget for the first season was $1,269,373, whereas the license fee received by NBC Studios from the NBC television network for the first season was $950,000.

[9] In its October 2003 accounting statement, NBC Studios calculated that gross receipts for *Profiler* were $163,203,805 and that deductions (for purposes of calculating the adjusted gross) were $188,268,713, leaving a negative adjusted gross of approximately $25 million. Using the Budget Formula, Sander/Moses calculated that gross receipts were $192,174,345 and that deductions were $173,332,718, leaving a positive adjusted gross of $18,841,627.

of proof should be shifted to NBC Studios. But the trial court refused to shift the burden, and instead gave an instruction that placed the burden of proof on Sander/Moses.

Sander/Moses proposed a general verdict form, while NBC Studios proposed a special verdict form. Ultimately, Sander/Moses acquiesced in a two-question special verdict form, the first question of which read: "Has Sander/Moses Productions, Inc. proved that the NBC network did not pay license fees (including customary breakage) to suppliers of programs comparable to Profiler in a similar broadcast year?" The second question on the form dealt with damages.

Over Sander/Moses's objection, the trial court gave a jury instruction concerning the meaning of the term "comparable" in the agreement's gross receipts formula.[10] The challenged instruction read: "The term comparable means capable of or suitable for comparison or similar. To determine what is comparable, you should consider only the factors that the evidence has shown were appropriate and consistent with the contract's purpose for determining license fees."

After slightly more than a day of deliberations, the jury notified the trial court that a verdict had been reached. Because the parties were close to settling the matter, they requested that the trial court seal the verdict so they could have additional time to attempt to finalize an agreement. In doing so, the parties stipulated to waive their right to poll the jury and to object to the form of the verdict. Based on that stipulation, the verdict was sealed and the jurors released. The next day, after the parties failed to reach a settlement agreement, the trial court unsealed the verdict. The jury had returned a verdict in favor of NBC Studios. Specifically, in response to question number one on the special verdict form, the jury answered "no." After judgment was entered on the verdict, the trial court found that NBC Studios was entitled under Code of Civil Procedure section 998 to recover its expert fees.

## III. DISCUSSION

### A. The Trial Court Did Not Err by Instructing the Jury That Sander/Moses Had the Burden of Proof

■ Challenges to jury instructions are subject to a de novo standard of review. (*People v. Posey* (2004) 32 Cal.4th 193, 218 [8 Cal.Rptr.3d 551,

---

[10] Prior to the close of evidence, the trial court, after discussing the matter with counsel in chambers, concluded that the facts concerning the interpretation issue were largely undisputed, and that the parties intended the term "comparable" to have its "plain meaning." The trial court then indicated that it would define the term "comparable" for the jury and allow the parties to "argue the purpose of that language as articulated by witnesses in applying that plain meaning."

82 P.3d 755].) In the absence of evidence justifying an alteration in the normal allocation of the burden of proof, the rule in California is that "a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting." (Evid. Code, § 500; see *Sargent Fletcher, Inc. v. Able Corp.* (2003) 110 Cal.App.4th 1658, 1667 [3 Cal.Rptr.3d 279] (*Sargent Fletcher*).) "It is true that '[t]he general rule allocating the burden of proof applies "except as otherwise provided by law." The exception is included in recognition of the fact that the burden of proof is sometimes allocated in a manner that is at variance with the general rule. In determining whether the normal allocation of the burden of proof should be altered, the courts consider a number of factors: the knowledge of the parties concerning the particular fact, the availability of the evidence to the parties, the most desirable result in terms of public policy in the absence of proof of the particular fact, and the probability of the existence or nonexistence of the fact.' (Cal. Law Revision Com. com., 29B West's Ann. Evid. Code (1966 ed.) § 500, p. 431.)" (*Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 660–661 [25 Cal.Rptr.2d 109, 863 P.2d 179]; accord, *Samuels v. Mix* (1999) 22 Cal.4th 1, 19 [91 Cal.Rptr.2d 273, 989 P.2d 701].)

Relying primarily on *Wolf v. Superior Court* (2003) 107 Cal.App.4th 25 [130 Cal.Rptr.2d 860] (*Wolf*), Sander/Moses argues that the trial court committed prejudicial error when it refused to reallocate the normal burden of proof and instruct the jury that NBC Studios had the burden of proof. According to Sander/Moses, apart from whether there is a fiduciary relationship, whenever a case involves contingent compensation based on financial information exclusively under the control of the defendant, the burden of proof automatically shifts to the defendant as a matter of law.

The court in *Wolf, supra,* 107 Cal.App.4th 25, decided the issue before it at the demurrer stage. Therefore, in analyzing the plaintiff's contention regarding the burden of proof, the appellate court in that case was required to treat the allegations of the complaint as if they were true. (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966–967 [9 Cal.Rptr.2d 92, 831 P.2d 317], citing *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58] and *Buckaloo v. Johnson* (1975) 14 Cal.3d 815, 828 [122 Cal.Rptr. 745, 537 P.2d 865].)

In the complaint in *Wolf, supra,* 107 Cal.App.4th 25, the plaintiff alleged that he entered into an agreement with the defendant Walt Disney Pictures and Television (Disney) in which he assigned to Disney the rights to his novel, Who Censored Roger Rabbit? (1981), as well as to the Roger Rabbit characters, and that in exchange for those rights, the plaintiff was to receive fixed compensation, as well as contingent compensation. (*Id.* at p. 28.) The plaintiff also alleged that an amendment to the agreement granted him audit

rights; that each time he attempted to exercise those rights, Disney failed to provide access to pertinent records; that Disney underreported revenues; and that Disney failed to disclose the nature of its third party agreements concerning the Roger Rabbit characters and the compensation received from those third party agreements. (*Ibid.*) Based on those allegations, the court in *Wolf* held that the plaintiff had failed to state facts sufficient to constitute a cause of action for breach of fiduciary duty. (*Id.* at p. 27 ["a contingent entitlement to future compensation within the exclusive control of one party does not make that party a fiduciary in the absence of other indicia of a confidential relationship"].) The court added that, "[i]n cases where the financial records essential to proving the contingent compensation owed are in the exclusive control of the defendant, fundamental fairness . . . requires shifting the burden of proof to the defendant." (*Id.* at p. 36.)

*Wolf, supra,* 107 Cal.App.4th 25, is not dispositive here. First, as noted, *Wolf* involved only the issue of whether the plaintiff had stated a cause of action for breach of fiduciary duty. Because of the procedural posture of the case, the court was not called upon to make a definitive determination as to whether the burden of proof should be shifted at the time of trial. Rather, the court merely observed that, "in contingent compensation and other profit-sharing cases where essential financial records are in the exclusive control of the defendant who would benefit from any incompleteness, public policy is best served by shifting the burden of proof to the defendant, thereby imposing the risk of any incompleteness in the records on the party obligated to maintain them." (*Id.* at p. 35.) But the court made that observation only in connection with the allegations in the complaint and in holding that there was no claim stated for breach of fiduciary duty.

The facts alleged in the complaint in *Wolf, supra,* 107 Cal.App.4th 25, concerning access to necessary financial information differ substantially from the facts in this case. There, Disney allegedly refused to turn over necessary information in response to repeated audit requests, and also allegedly refused to disclose the nature of its relationships with third parties regarding the marketing and sales of Roger Rabbit merchandise.

 Here, there is no evidence that the information necessary to calculate the amount of contingent compensation to which Sander/Moses was entitled under the agreement was unavailable. To the contrary, the record shows that Sander/Moses was provided information through the audit process, including information about other programs. Moreover, Sander/Moses's expert was able to calculate its damages based on the available information. And Sander/Moses took the position in its opening brief that the amount to which

it was entitled was undisputed.[11] Thus, unlike the situation presented by the facts pled in *Wolf, supra,* 107 Cal.App.4th 25, Sander/Moses had the ability to prove the amount of compensation to which it claimed it was entitled. Accordingly, there was no need to shift the burden of proof.

In addition, even if NBC Studios had "exclusive" control over information essential to Sander/Moses's case on liability, there is nothing in the record to suggest that NBC Studios withheld such information, a fact that distinguishes this case from *Wolf, supra,* 107 Cal.App.4th 25. Contrary to Sander/Moses's assertion, "[g]reater access to relevant evidence does not mandate that a defendant bear the burden of proof on the issue." (*Sargent Fletcher, supra,* 110 Cal.App.4th at p. 1671.)[12] Sander/Moses made no showing in the trial court that it was unable to obtain the information needed to establish its claimed rights.

██ " 'On rare occasions, the courts have altered the normal allocation of the burden of proof.' . . . But the exceptions are few, and narrow." (*Sargent Fletcher, supra,* 110 Cal.App.4th at p. 1670, quoting *National Council Against Health Fraud, Inc. v. King Bio Pharmaceuticals, Inc.* (2003) 107 Cal.App.4th 1336, 1346 [133 Cal.Rptr.2d 207].) Unlike the burden of proof (or burden of persuasion) which does not shift during trial, the " 'burden of producing evidence' " (Evid. Code, § 110) or burden of going forward "*may* shift between plaintiff and defendant throughout the trial." (*Sargent Fletcher, supra,* 110 Cal.App.4th at p. 1667.) Although "exceptions to the general rule placing the burden of proof for prima facie elements on defendants are made when it is otherwise impossible for the plaintiff to make its case, and when policy considerations support affording the plaintiff greater protection" (*id.* at p. 1673), Sander/Moses failed to show that such an exception to the normal allocation of the burden of proof was appropriate in this case.

B.–F.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[11] According to Sander/Moses, "[t]he evidence is undisputed that if the calculation is made in this fashion [using the Budget Formula], the adjusted gross receipts for *Profiler* . . . are in fact a positive $18,841,627."

[12] Under *Sargent Fletcher, supra,* 110 Cal.App.4th 1658, Sander/Moses would have to demonstrate why specific information necessary to prove its case was not obtained from NBC Studios during discovery, or why such information was received too late to be useful at trial. (*Id.* at p. 1673 ["Defendants almost always are in a better position to know what they did and why they did it. Liberal rules of discovery apply to even up that particular playing field"].)

[*] See footnote, *ante,* page 1086.

## IV. DISPOSITION

The judgment of the trial court is affirmed. NBC Studios is awarded its costs on appeal.

Turner, P. J., and Kriegler, J., concurred.

A petition for a rehearing was denied October 11, 2006, and appellant's petition for review by the Supreme Court was denied November 29, 2006, S147508.