Filed 2/9/17; part. pub. & mod. order 3/10/17 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| VALERIE YALE, | B260762 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC499388) |
| v. | |
| ROBERT R. BOWNE, II, | |
| Defendant and Appellant. | |

APPEALS from a judgment of the Superior Court of Los Angeles County. Maureen Duffy-Lewis, Judge. Affirmed with modifications.

Joshua R. Furman Law Corp., Joshua R. Furman for Plaintiff and Appellant.

Stephen R. Rykoff for Defendant and Appellant.

This case arises from a claim of attorney malpractice in the preparation of an estate plan. The jury found that defendant Robert R. Bowne, II (Bowne) had breached the standard of care in failing to properly implement Valerie Yale's (Yale) express instruction to maintain her assets as her separate property in the trust document which Bowne prepared for her and her then husband, Bryan Knight (Knight).[1]

Each party finds error in elements of the jury's monetary award, and in the trial court's denial of Yale's motion for prejudgment interest.[2] We will conclude that the trial court correctly gave the comparative fault instruction requested by Bowne and that substantial evidence supports the jury's award of $260,000 in damages (to be reduced under the jury's comparative fault determination), but that the award for investment losses claimed by Yale was not supported by substantial evidence; nor is Yale entitled to prejudgment interest.

## FACTUAL AND PROCEDURAL HISTORY

We set forth those facts relevant to the issues presented by the parties. Also, we set out the facts in the light most favorable to the jury's verdict. (*Sacramento Sikh Society Bradshaw Temple v. Tatla* (2013) 219 Cal.App.4th 1224, 1227.)

Yale grew up in the family's retail electronic business, eventually computerizing parts of it and expanding it, and, after her mother's death and her father's move out of state, and when technology passed it by, selling the

---

[1] Knight was not a party to this action, nor did he testify at trial. He and Yale were divorced prior to commencement of the litigation that is the subject of this appeal.

[2] Bowne does not contest the jury's finding that he was negligent.

2

business real property and assets, and retiring. Her first marriage ended in divorce in 1981 and involved a "terrible financial situation," which she believed resulted in her first husband "[taking] half of everything I had."

In 1982, after she retired, she decided to take up tennis, then meeting tennis pro Knight. They lived together from the year in which they met until 1997, when then married, and through December 2011, when events described below led to their separation and divorce. Prior to their marriage, they entered into a prenuptial agreement which specified that Yale's property was to remain her separate property.

In 1994 she updated an earlier living trust to provide for Knight, including making him the beneficiary for his life of her asset upon her death, with the remainder to go on his death to specified individuals and charities. In 1999, in another update to her living trust, she made Knight successor trustee. Yale's assets included her family's home on Arrowhead Drive (the house) which she had purchased from her father with her own funds prior to his departure from California.

In late 2009, Yale had "done a refi of the house." The lender had required that Knight co-sign on the transaction; this resulted in the creation of a Home Equity Line of Credit (HELOC) against which either Yale or Knight could draw funds. When problems arose in early 2010 in completing the transaction, Knight referred Yale to Bowne, who helped resolve those issues, including returning the vesting on the house to her separate property from the community property vesting which the lender had required.

On her March 30, 2010 visit to Bowne's office, aware that Bowne considered himself to be an estate planning attorney, she began speaking with him about again updating her trust. She considered this to be a good idea as it had been over 10 years since the previous update. After meetings

3

and e-mails, Bowne prepared estate planning documents which Yale and Knight signed in Bowne's office on May 21, 2010.

Later in 2010 Knight began having issues at work; he stopped sleeping and exhibited signs of extreme stress. One day in November 2010, he called Yale from work and asked her to pick him up. When she arrived to get him, he was standing at the curb. Yale testified that he "wasn't in good shape." She took him to a psychiatrist who diagnosed him with depression, prescribed medication, and gave him a note to advise his employer that he could not return to work until the doctor cleared him. Knight's condition did not improve. On December 26, 2011, Knight attacked Yale inside their home, coming up behind her, choking her, and attempting to suffocate her. She managed to trigger an alarm company panic alarm. The police arrived, breaking down a door to gain entry. Once inside, they observed Knight strangling Yale, and took Knight into custody. Yale obtained a domestic violence restraining order the next day which included an order that Knight move out of the house.

Yale became concerned about both her personal and financial safety and went to attorney Charles Larson (Larson), whom she described as "a trust attorney," three days later, on December 29, 2011. He reviewed her documents, told her that everything was community property and advised her that she should get all of her assets out of the family trust and he would prepare documents to do that. The next day she returned to sign a deed to transfer the house back to her name as her separate property. He also advised her that this did not solve the problem with the securities account she and Knight, as trustees, maintained with Vanguard and suggested that she contact Vanguard and ask them for help to transfer those assets to an account in her name (outside of the trust that Bowne had established).

4

During the same period of time, Knight called her from jail, asking her to put the house up as collateral so he could bail out. She refused to do so.

Yale next opened a new separate property account at Vanguard, and wrote checks on the existing Vanguard money market account to close it, depositing the funds in the new account. Because Vanguard had told her it would take seven to 10 days to transfer the brokerage account from its present status in the trust to any new account, which she wanted to do, and it would be difficult on the last day of the calendar year for her to find a financial institution with the authority to affix the required Medallion signature guarantee[3] verifying her signature, Yale decided she could not wait and proceeded to sell all of the holdings in the brokerage account. She completed the sales within a few days and deposited the proceeds in a new Chase Bank account she had set up in her name. By mid-January she had transferred those proceeds to the new Vanguard accounts vested in her name only. In December 2011, before she began the transfer and sales of assets, the accounts consisted of a money market account, mutual funds, and E.T.F.S (described in the record as a "basket" of stocks), all selected by her.

Once all funds were in the new, separate property Vanguard accounts, Yale began to watch the stock market to see if there was a point at which she could "get back in when the market was low." She testified that the opportunity came about June 3rd or 4th of 2012 when there was a five percent "dip." She did not have a financial adviser because "Ever since I retired, I wanted to handle my own money because that was the last money

---

[3]   A Medallion signature guarantee assures that the signature of the account holder will be recognized as genuine by the transfer agent. (SEC.gov/Medallion Signature Guarantees: Signature Guarantees: Preventing the Unauthorized Transfer of Securities http://www.sec.gov/answers/sigguar.htm> [as of Jan. 27, 2017].)

5

that I was going to be making and it was to see me though retirement. [¶] And frankly, I just got really interested in learning about investing; so, I started to subscribe to newsletters and basically teaching [sic] myself about investments so I didn't do something dumb, and I really enjoyed it. In fact, it was similar, you know, to managing money at my business, and it's just, you know, something that I felt confident in doing." She was fully invested by June 2012.

On February 15, 2012, Knight had Yale served with divorce papers. Shortly after he started the divorce proceedings, he withdrew $200,000 against the HELOC. Yale hired attorney Bruce Abramson (Abramson) to represent her in the divorce. She testified that Abramson recommended that she settle the divorce proceedings with Knight on terms which included Yale paying him $260,000, an amount reached in the course of settlement negotiations. Abramson advised this would be reasonable to avoid potentially losing half of everything based on the claim that the estate plan Bowne had put in place transmuted all of her separate property to community property. She accepted his advice and the matter settled in late 2012. The property settlement agreement included a provision that Knight would receive the $260,000 in exchange for releasing Yale from any obligation to pay any larger sum. Yale fulfilled that obligation by paying Knight $60,000 in cash and assuming the obligation to repay the $200,000 due to the lender under the HELOC.

Yale's complaint originally contained causes of action for negligence and for breach of fiduciary duty. She dismissed the latter claim prior to trial.

The jury's verdict included findings that both Bowne and Yale were negligent, allocating fault 90 percent to Bowne and 10 percent to Yale. The jury awarded damages of $260,000 for the amount Yale had paid to Knight to

6

resolve the monetary aspects of their divorce; $57,170 in investment losses she incurred in her Vanguard accounts; and $39,000 to reimburse her for attorney fees she had paid to her divorce and other attorneys for representation in that action and which was attributable to errors made by Bowne in preparing the estate plan.  The parties filed a timely appeal and cross-appeal.

## CONTENTS

Yale contends:  (1) giving the jury an instruction on comparative fault by Yale was error; (2) no substantial evidence supports the jury's reduction in the amount awarded for investment losses; and (3) she is entitled to prejudgment interest.

In addition to disputing these contentions, Bowne contends in his cross-appeal that there was no substantial evidence to support (1) an award of any damages for Yale's claimed investment loss;  or (2) $200,000 of the $260,000 awarded in connection with Yale's divorce settlement.

## I.    The Comparative Fault Instruction

Among the instructions given to the jury were an instruction on professional negligence and, over Yale's objection, an instruction on comparative negligence which Bowne had requested.[4]  Yale contends the trial court erred in giving the comparative fault instruction, arguing:  (a) no California appellate court decision has discussed application of the principle

---

[4]    The comparative fault instruction, given in a manner consistent with the Judicial Council's Civil Jury Instruction No. 406, provided in part: "[Bowne] claims that [Yale]'s own negligence contributed to her harm.  To succeed on this claim, [Bowne] must prove both of the following:  1. That [Yale] was negligent; and [¶] 2. That [Yale]'s negligence was a substantial factor in causing her harm."

of comparative fault in attorney malpractice cases; (b) the instruction should not have been given because Yale did no more than rely on her lawyer's advice, (c) "public policy considerations" require the instruction not be given when the client does not have the knowledge to understand the documents the lawyer has prepared, and (d) the instruction is inappropriate when "the client's conduct does not interrupt the causal chain from the attorney's negligence." At oral argument counsel for Yale conceded that comparative fault instructions may be appropriate in attorney malpractice cases in certain circumstances. We will therefore focus our discussion on whether sufficient circumstances were presented in this case and will conclude that substantial evidence did warrant the giving of such an instruction.

A. Additional facts

Yale first sought Bowne's legal advice in completing the transaction by which she and Knight obtained the HELOC on the house in 2009. The transaction included removing the house from her then trust, vesting title in herself alone, obtaining the new loan (the HELOC), and then, as a condition she had placed on the transaction, returning the title vesting to her as her separate property and as trustee of her trust. She did all of this because the new lender had required that Knight "be put on the loan" as a co-signer (Yale did not have sufficient income by herself to obtain it) and be equally obligated to make any repayments on sums borrowed. This required that title to the house be conveyed from Yale as trustee of her separate trust to her as her separate property, then to her and Knight as community property. Yale had secured the lender's agreement that once the loan was recorded, title could be returned to her as her separate property. When Yale encountered problems in completing the deed recordation process, Knight suggested that she seek Bowne's assistance. Knight knew Bowne through Bowne's relationship with

8

the bank at which Knight was then working. Yale obtained Bowne's help in early March 2010, and during that month he completed the transfers as she had wanted.

Once Bowne had completed the title transfers, Yale decided to retain him to update her estate plan. In a series of meetings and via email, Yale explained to Bowne her desires, including that her property must remain her separate property. Bowne explained to her ways to achieve her objectives, which also included Knight succeeding her as trustee on her death or incapacity. On May 21, 2010, Yale and Knight went to Bowne's office to hear his explanation of the documents he had prepared and to sign them as needed. She did not read all of the documents, but did read certain portions. The first document they signed was the new trust. She read paragraph 1.2(B) of that document, "Property to Retain its Character," which declared that both separate and community property were being placed in the new trust. She did not raise any issue concerning the meaning of this paragraph with Bowne.

Yale also read the granting clauses of the three deeds she signed that day. She understood the execution of these deeds to be part of the process of transferring the house from her 1999 trust to this new trust. When she read the words "community property" in two of the deeds, she understood what that meant but she did not say anything to Bowne about the use of the term "community property" or raise any other question with him about the effect of these deeds. At the time the 2010 trust was created, her separate property was worth approximately $2 million. Shortly after completing the meeting at Bowne's office, Yale changed the vesting on the investment account she had at Vanguard, revesting it as "Valerie A Yale & Bryan J Knight TR UA 05-21-2010 The Valerie A Yale and Bryan J Knight Fam Tr."

9

B. Applicable law

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him [or her] which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572.) "The propriety of jury instructions is a question of law that we review de novo. [Citation.]" (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 82; *Sander/Moses Productions, Inc. v. NBC Studios, Inc.* (2006) 142 Cal.App.4th 1086, 1094; *National Medical Transportation Network v. Deloitte & Touche* (1998) 62 Cal.App.4th 412, 426-427.)

The principle of comparative fault was established in our Supreme Court's decision in *Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804 (*Li*). In rejecting the prior doctrine of contributory negligence, our Supreme Court explained that the former doctrine was "rooted in the long-standing principle that one should not recover from another for damages brought upon oneself [citations omitted.]" (*Id.* at p. 810.) The consequence of application of this doctrine (with some exceptions) was that the plaintiff recovered nothing when he or she was found to have contributed in any way to the harm created by the fault of the defendant. Notwithstanding the long history of the doctrine, the *Li* court concluded that this "'all-or-nothing'" approach "is inequitable in its operation because it fails to distribute responsibility in proportion to fault" (*Ibid.,* fn. omitted), and that the contributory negligence defense should be replaced "by a system under which liability for damage will be borne by those whose negligence caused it *in direct proportion to their respective fault.*" (*Id.* at p. 813, fn. omitted, emphasis added.) The fundamental purpose of the new principle of comparative fault was, in the court's judgment "to assign responsibility and liability for damage in direct proportion to the amount of

10

negligence of each of the parties. Therefore, in all actions for negligence resulting in injury to person or property, the contributory negligence of the person injured in person or property shall not bar recovery, but the damages awarded shall be diminished in proportion to the amount of negligence attributable to the person recovering." (*Id.* at pp. 828-829.) The court adopted the new rule of comparative fault based on "considerations of fairness and public policy. [Citations omitted.]" (*Id.* at p. 829.)

In the present case, then, the question before us is whether there was substantial evidence to warrant the giving of a comparative fault instruction.

In considering the jury instruction challenged in this case, we begin with the recognition that legal malpractice actions in California are a subset of negligence actions in general and are governed by the rules of pleading and proof applicable to all negligence actions except to the extent "the Legislature has statutorily modified, restricted, or otherwise conditioned some aspect of an action for malpractice . . . . " (*Flowers v. Torrance Memorial Hospital Medical Center* (1994) 8 Cal.4th 992, 998-999.)

Yale asserts that applying the principle of comparative fault "defies reason" because of "the great disparity in knowledge and experience between lawyers and [their] clients," and in particular in this case. However, in this case, the facts support the giving of the challenged instruction. It is undisputed that Yale read the granting clauses of the deeds, saw the change from separate property to community property in two of the deeds, and was entirely conversant with the issue as she had just completed a transaction involving the identical property which included her insisting that the same parcel be restored from community property to separate property status at the conclusion of the HELOC transaction. Notwithstanding her knowledge and having just completed that transaction, she remained silent rather than

11

ask the same lawyer who had represented her in completing that transaction why it was appropriate to sign the deeds now presented to her containing these particular granting clauses: Yale had the basic knowledge to pose a question to Bowne rather than remain quiet. It was for the jury to evaluate whether her failure to ask a question contributed to the situation for which she now sought damages.

Yale's reliance on *Theobald v. Byers* (1961) 193 Cal.App.2d 147 (*Theobald*) and on *Daley v. County of Butte* (1964) 227 Cal.App.2d 380, is misplaced. In *Theobald*, a legal malpractice action (applying contributory negligence doctrine as it preceded *Li*), the plaintiff's agent had no knowledge of the intricacies of the recording statute and of the financial consequence (loss of priority in payment under federal bankruptcy law) of failing to comply with them. (*Theobald,* at pp. 152-153.) In *Daley*, the issue was whether the attorney's neglect in missing litigation deadlines should be imputed to the client. That court's holding, that the client is not to be charged with such specialized knowledge of the arcane aspects of civil procedure, also has no application here.

In this case, the facts and circumstances recounted above, as well as her testimony that she had made an egregious error in her first marriage by allowing property to be transmuted to community property status, constituted sufficient evidence that the issue of comparative fault was properly placed before the jury.

One of Yale's arguments reveals a misunderstanding of the way in which the issues of negligence liability and comparative fault relate to one another. Acknowledging that some system of comparative fault is to be allowed, Yale argues, "While there is no doubt that a comparative negligence defense can be asserted in a legal malpractice case as a general matter, the

12

application of the defense cannot diminish the defendant lawyer's duties." It does not follow from this statement that comparative fault does not apply in legal malpractice cases, however. To so contend fails to distinguish between the two legal principles: the first, whether the lawyer was negligent, which may be summarized as an inquiry concerning the lawyer's professional duty and whether the lawyer has breached the standard of care to the damage of the plaintiff. The second asks a different question, whether the conduct of the client invokes application of principles of comparative fault to assist in allocating part of the responsibility, if any, for the claimed damages to the client. The two inquires operate in related, but somewhat different ways. The following quotation from *Prosser on Torts* explains the distinction: "Negligence as it is commonly understood is conduct which creates an undue risk of harm to others. Contributory negligence is conduct which involves an undue risk of harm to the actor himself. Negligence requires a duty, an obligation of conduct to another person. Contributory negligence involves no duty, unless we are to be so ingenious as to say that the plaintiff is under an obligation to protect the defendant against liability for the consequences of his own negligence." (Prosser, Law of Torts [Torts (4th ed. 1971] § 65, p. 418; *Daly v. General Motors Corp.* (1978) 20 Cal.3d 725, 735.)

Thus, if the finder of fact determines that the lawyer has breached his or her duty, causing damage to the client, it must then be determined if the client bears any share of responsibility for the harm caused, viz., whether comparative fault principles apply. That is why the comparative fault instruction in this case was appropriately given.

*Cases from other jurisdictions.* Yale constructs her argument in large part upon the authority of cases from other jurisdictions. Such a course is fraught with difficulty due to the variations that share the same legal

13

"umbrella" term "comparative fault" as a descriptor. While 46 states have adopted the principle of "comparative negligence," there are multiple versions of this doctrine. (See, e.g., Article: Johnson, The Unlawful Conduct Defense in Legal Malpractice (2008-2009) 77 UMKC L.Rev. 43, 78.) Some states have adopted versions of comparative negligence by act of their state legislatures, others have done so by judicial decision. The variations in how the doctrine is applied comprise a virtual rainbow of alternatives, emanating from three basic types, identified by Prosser and Keeton as "pure, modified, and slight-gross." (Prosser & Keeton, Torts (5th ed. 1984) Negligence, Defenses, § 67, p. 471.) In addition, the Uniform Comparative Fault Act (12 U.L.A. (Master Ed.), p. 121) has been adopted in some states.

Yale does not discuss the source of the doctrine of comparative fault that is in use in each of the states from which she has selected cases to cite. Because of the variation in the several versions of this principle, we find giving weight to out-of-state court rulings lacks analytical value as well as any persuasive force. This is certainly so when our Supreme Court made clear in *Li* the scope of application of the principle.

Yale cites one unpublished federal district court case, *Bank Saderat Iran, N.Y. Agency v. Telegen Corp.* (N.D. Cal. Oct 16, 1997, WL 685247) [nonpub. opn.] and argues that it supports her claim, quoting the following language from this unreported case: "A client . . . does not have an independent obligation to double-check the work of her attorney. She has a right to rely on her attorney's advice about legal matters because the attorney has superior expertise and knowledge of the law." That court then cites *Theobald* and *Day v. Rosenthal* (1985) 170 Cal.App.3d 1125. We have explained *ante* why reliance on *Theobald* is inapposite. The issue both in *Saderat* and in *Day* concerned allegations of breach of fiduciary duty; indeed,

14

in *Day* the lawyer had become the client's business manager and was found to have defrauded the client. There is no discussion of comparative fault in either case, making reliance on either inappropriate. Thus, we do not find this unreported case to be of any persuasive value.

Yale's argument that there must be evidence of causation before a comparative negligence instruction is given is not disputed by Bowne. Bowne's fundamental argument on the matter of causation is that Yale was aware of the problem with the deeds and had an obligation to bring her concern to Bowne's attention—but did not do so, thus contributing to her damage, and validating the giving of the instruction in this case.

The requirement that there be evidence of the plaintiff's own deficient conduct before a comparative fault instruction is appropriately given was discussed, and affirmed, by our Supreme Court in *LeMons v. Regents of University of California* (1978) 21 Cal.3d 869, 875.

C. Public policy

Yale further contends that, in this case, there is no policy reason to hold Yale even partly responsible "for spotting and understanding the significance of her own lawyer's error in 137 pages of documents that she hired the lawyer to produce. Under these circumstances, the comparative fault analysis does no less than impose a constructive suspension of the duties owed by the lawyer to the client." [¶] . . . [¶] The only arguable basis for assigning any blame on Yale would be to suggest that she failed to 'supervise, review, or inquire as to the representation.'"

The facts of this case, however, reveal that Yale read the granting clauses of the deeds before she signed them, understood the meaning of the terms she read, and chose to remain silent. There were sufficient facts, given Yale's very recent familiarity with the issue, for us to conclude that no public

15

policy reason makes Yale's own conduct immune from consideration by the jury. Moreover, Yale's assertion is belied by our Supreme Court's explanation in *Li* that public policy is one of the reasons for its adoption of the principle of comparative fault. (*Li*, *supra*, 13 Cal.3d at pp. 829-830.)

D. Conclusion

We conclude that the court correctly instructed the jury on the principles of comparative fault.

We defer discussion of Yale's other contentions as our resolution of certain of Bowne's contentions affects them.

## II. The Amount Awarded for Investment Losses

The jury's verdict included an award of $57,100 to Yale for investment losses.[5] Yale and Bowne have overlapping claims regarding the gross amount of this award. Bowne argues that there is no substantial evidence to support the award in any amount, while Yale argues that no substantial evidence supports the jury's reduction from the larger amount ($247,737) which her expert witness testified was due.[6] We will conclude that Bowne is correct.

A. Additional facts

Prior to meeting Knight, Yale had invested funds with Vanguard.[7] She maintained her accounts with Vanguard after she and Knight were married.

---

[5] The jury also found Yale 10 percent at fault, requiring a corresponding reduction in this award.

[6] The parties agree that we review the jury's award for substantial evidence. (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 629.)

[7] There is little in the record concerning the nature of the services which Vanguard provides. We take judicial notice that it is a large investment company which holds investors' funds and securities, some of which are

16

In implementing the estate plan prepared by Bowne, Yale transferred title on her Vanguard accounts[8] to herself and Knight as trustees of the new trust. Immediately after her meeting with Larson at the end of December 2011, at which he advised her to remove assets she claimed as her separate property from joint ownership or vesting with Knight, and continuing in early January 2012, Yale expeditiously sold all of the assets in the Vanguard accounts, completing the sales by mid-January 2012. She was concerned that Knight, who had the ability as co-trustee to access the accounts, and was still in jail and had asked her to post his bail, might sell assets held in the Vanguard accounts to raise money for his bail, or for other purposes. She testified that her intent in closing the accounts was to terminate any potential access by Knight and return the assets to her sole control. After she completed the withdrawals, she opened new accounts at Vanguard, and, by mid-January 2012, had redeposited all of the proceeds of the just-made sales in new Vanguard accounts solely in her name.[9] The total amount redeposited was $654,040. No fees had been incurred in the process.[10]

---

proprietary funds. It also issues periodic statements to investors utilizing its services. (Evid. Code, § 452, subd. (g) [matters of common knowledge].)

[8]     It is undisputed that Yale was the sole source of the assets placed with Vanguard. It is unclear whether Yale had a single, or multiple, accounts. We adopt the parties' practice of using the plural when referring to Yale's holdings at Vanguard.

[9]     The record does not clearly indicate, but it is a reasonable inference that the redeposited funds were placed in money market accounts pending reinvestment in securities, as is now discussed in the text.

[10]     There is no evidence in the record that Yale incurred either fees or any net capital gains on the sales she made, and only fragmentary evidence regarding tax basis issues that might have affected her decision.

Yale then considered purchasing the same portfolio of securities as she had just sold, which she could do, also without any transaction costs, but decided not to do so. Instead, she waited for what she considered an appropriate time to reinvest, which occurred in June 2012. At that time, she reinvested in a different mix of securities, but maintained the goal of having "a balanced portfolio of asset allocation."

Yale's expert in securities matters, Mason Dinehart III, (Dinehart) testified that Yale lost $247,737 between the time of the sales in December 2010 and January 2011, and March 2014, the month prior to the trial. To obtain this number, he determined the market value of the securities held in the Vanguard accounts once Yale had completed the sales ($654,040) and the value of the identical investments (assuming that Yale would have continued to hold them throughout) in March 2014 ($901,777); then he subtracted the earlier value from that in 2014. The arithmetic difference of $247,737 was, according to Dinehart, the investment loss caused by Bowne.[11]

Dinehart testified that the stock market was at the same level in June 2012 as it had been in January of that year. He also testified that, in June, Yale could have reinvested in all of the same securities she had sold in January and in the prior December. When he asked her about her decision not to repurchase the identical assets in January, she told him "Now that I'm in cash and have freedom to choose any stocks that I want—any mutual funds that I want or exchange traded funds—she took the best performers at that time, now that she had a fresh start. It was now time to reinvest, and she did and she picked the best ones at that time." He also testified that when Yale reinvested the funds in June 2012, "she was very careful to

---

[11] The evidence also indicated that Yale incurred no transaction cost in either selling or buying securities through Vanguard. The record indicates that an annual maintenance fee is charged instead.

18

equalize the sectors." When she did reinvest in June 2012, Yale told Dinehart that she had adopted a different investment strategy, repurchasing only two of the investment funds she had owned before. Dinehart stated that, had she repurchased the identical assets in January 2012 as soon as she had the funds in her new, separate account, her cost basis "[would have been] pretty close."

Dinehart did not do a calculation of what Yale's actual securities portfolio, which she purchased in June 2012, was worth in March 2014, nor did he calculate its investment gain. He was aware that Yale withdrew approximately $200,000 from her stock account by the end of 2012. This was one of the reasons he did not analyze this new portfolio.

Lisa Roth, a registered broker-dealer called by the defense testified that, in January 2012, Yale could have repurchased the same securities as she had sold. Roth testified that Yale's new investment strategy was successful, Yale did make money, and was able to withdraw $210,000.

B. Discussion

Dinehart's testimony does not establish that Yale was damaged or that Bowne was a cause of her monetary "loss." Rather, his testimony (corroborated by Roth's) that Yale could have repurchased the same securities in January 2012 as she had just sold, and do so without any transaction cost—is evidence that she would have profited by the amount that Dinehart claimed were her damages had she done so. He also testified that she could have made the same purchases at the same prices in June of that year.

Yale testified that she decided to wait and read and study before she reinvested. Bowne points out that he did not cause the claimed investment loss; rather it was solely a result in Yale deciding not to repurchase the same

securities in mid-January 2012, and he points out, when she re-entered the market, she did so under a different investment perspective. Thus, he argues, that there is no substantial evidence of loss in any event.

With respect to his first argument, Bowne relies on uncontroverted evidence that Yale alone made the decision to not repurchase in mid-January 2012 the identical assets she had just sold even though, as we noted above, she could have done so without incurring any transaction costs. Instead, Yale decided on her own to wait until June of that year to fully reinvest, meanwhile reading and educating herself on investments. When she re-entered the market that June, she testified without contradiction that she then implemented a somewhat different investment strategy. There is no dispute in the testimony: Yale herself determined to modify her investment philosophy and Yale chose not to reinvest in January, but instead wait until June 2012 to reinvest in full.

As Bowne argues, "It is axiomatic that a defendant cannot be held liable in tort for an injury he or she did not cause." In addition to being a "but-for cause," the defendant's conduct must be a substantial factor in bringing about the injury for which the plaintiff seeks damages. (*Brookhouser v. State of California* (1992) 10 Cal.App.4th 1665, 1677.) Here, there is no substantial evidence that Bowne's conduct played any part in Yale's decision in January 2012 to change her investment philosophy and to wait until June 2012 to become fully reinvested in a "somewhat different" securities portfolio. Nor is there any substantial evidence that Yale actually sustained any loss.[12]

---

[12]    Nor did Dinehart calculate Yale's investment gain on the investments she did make in June 2012. The amount of that gain should have been available to compare to the "loss" which Dinehart did calculate, to determine whether there was in fact any net investment gain, or loss.

20

For these reasons, Yale's additional contentions that the jury erred in reducing the amount of investment damages, and thus, that she is entitled to a greater amount of such damages, are moot.

## III. Prejudgment Interest

Yale argued in her briefs that she is entitled to prejudgment interest pursuant to statute (Civ. Code, § 3287, subd. (a)), and pursuant to case law, on each element of her damages (on the divorce settlement, attorney fees incurred in connection with it, and on the amount awarded for her investment losses).[13] At oral argument, she conceded that she would not be entitled to prejudgment interest on the amount of the investment loss as it was substantially reduced by the jury (and is now disallowed its entirety). We will conclude that this contention is without merit.

The matter of whether prejudgment interest is properly awarded is reviewed for abuse of discretion. (*Bullis v. Security Pac. Nat. Bank* (1978) 21 Cal.3d 801, 814; *Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.*, *supra*, 47 Cal.App.4th at p. 492; *Moreno v. Jessup Buena Vista Dairy* (1975) 50 Cal.App.3d 438, 448.) But it is a question of law whether any interest is allowable. (*California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699.) (Because we determine that the principle amounts sought by Yale were not liquidated, and therefore prejudgment interest was not properly to be awarded, we do not address the additional issue of whether Civil Code section 3288 precludes any award of prejudgment interest in any event.)

---

[13] As we have determined that Yale is not entitled to recover any amount for her claimed investment losses, she is not entitled to recover any prejudgment interest on this amount in any event. (*Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.* (1996) 47 Cal.App.4th 464, 492.)

21

Yale made a motion after trial seeking prejudgment interest, relying on Civil Code sections 3287, subdivision (b) and 3288, which was denied. On appeal, Yale argues that the award of prejudgment interest was mandatory, relying on Civil Code section 3287, subdivision (a) and language in *North Oakland Medical Clinic v. Rogers* (1998) 65 Cal.App.4th 824, 828 (*Rogers*).

The statement in *Rogers* upon which Yale relies is a quotation from a practice book on civil trials which states that the award of interest is not discretionary "from the first day there exist[] *both a breach and a liquidated claim*." (*Rogers*, *supra*, 65 Cal.App.4th at p. 828, quoting from Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 1997) ¶¶ pp. 17:185, 17:189, pp. 17-40.23, 17-40.24, emphasis added.)

Yale next argues that each element of her damages as to which she seeks prejudgment interest was liquidated, viz., fixed, in amount. Bowne does not agree; nor do we.

Bowne addresses the difficulty with Yale's argument in his argument that the amount of damages was not certain until the jury made a determination as to the comparative fault of the parties; thus, the amount was uncertain until the verdict was rendered; and, accordingly, the award of any prejudgment interest would have been error. The trial judge found Bowne's argument persuasive, relying on *Wisper Corp. v. California Commerce Bank* (1996) 49 Cal.App.4th 948, 960 (*Wisper*). As noted above, we review the trial judge's determination under Civil Code section 3287 for abuse of discretion. (*Bullis v. Security Pac. Nat. Bank, supra,* 21 Cal.3d at p. 814; *Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.*, *supra*, 47 Cal.App.4th at p. 492; *Moreno v. Jessup Buena Vista Dairy*, *supra*, 50 Cal.App.3d at p. 448.)

The decision in *Wisper* relies in part on the reasoning in *Stein v. Southern Cal. Edison Co.* (1992) 7 Cal.App.4th 565, an opinion by Division Six of this court, which pointed out that "[w]here the amount of damages cannot be resolved except by account, verdict or judgment, [prejudgment interest is not appropriate]." (*Id*. at p. 573.) We find the holdings of these cases to be dispositive; there was no abuse of discretion in the trial judge's denial of Yale's motion for prejudgment interest.

## IV. Damages Based On the Settlement of the Dissolution Action

Bowne contends there is no substantial evidence to support the award of $200,000 of the $260,000 for which Yale settled her dissolution of marriage action. Bowne bases this argument on the contention that the amount he contests was not the result of anything he did or did not do; instead it was the direct result of Knight's draw down on the HELOC. In support of his claim, Bowne emphasizes that (1) the HELOC was obtained with the mutual consent of the parties and Yale's express agreement that any amounts drawn on the HELOC would be a lien against that property, and (2) the HELOC was obtained prior to the time Yale first met Bowne.

A. Additional facts

The HELOC was obtained in 2009 after the parties were married. The only involvement which Bowne had with respect to it was redrafting and recording the deed, returning the vesting of the house to Yale as her separate property from community property which the lender had required as a condition of making the loan.

Yale and Knight reached a settlement of their dissolution action which provided in part that she would pay him $260,000. She did this by withdrawing $60,000 from her Vanguard accounts and assuming the $200,000 in debt that Knight had incurred.

23

B. Discussion

The amount of debt which Yale assumed to meet the terms of her dissolution settlement with Knight is not a separate item of damages as Bowne contends. Instead, as Yale argues, her assumption of the debt represented by the balance due on the HELOC was a means for her to satisfy her monetary obligation to Knight under their settlement without further liquidating her Vanguard accounts or raising funds from other sources. It was thus a "proxy" for a cash payment of the balance of the settlement amount. Yale testified that she did not want to totally liquidate the Vanguard accounts to satisfy her obligations under the dissolution settlement. Instead, she took $60,000 from her Vanguard account and discharged the balance of her monetary obligation to Knight by taking over the HELOC debt which Knight had incurred. Bowne simply mischaracterizes the reason why Yale assumed the sole obligation to repay the $200,000 which Knight had borrowed. His contention lacks merit.[14]

---

[14] In his cross-appellant's reply brief, Bowne claims that Yale has raised new arguments on appeal. Bowne does as well. However, new arguments raised for the first time in a reply brief are properly disregarded. (E.g., *Varjabedian v. City of Madera* (1977) 20 Cal.3d 285, 295, fn. 11; *Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 763-765.) The same principle applies to the arguments newly advanced in the letter briefs the parties filed in response to our first letter of inquiry prior to argument. Therefore, we do not consider any such arguments.

## DISPOSITION

The judgment is modified by striking the award of damages for $57,170 in investment losses.  As modified, the judgment is affirmed.  Each party is to bear its own costs on appeal.


_____, J.[*]
                                            GOODMAN

We concur:


_____, Acting P.J.
        CHAVEZ


_____, J.
        HOFFSTADT

---

[*]    Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 3/10/17

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| VALERIE YALE,<br><br>     Plaintiff and Appellant,<br><br>     v.<br><br>ROBERT R. BOWNE, II,<br><br>     Defendant and Appellant. | B260762<br><br>(Los Angeles County<br> Super. Ct. No. BC499388)<br><br>**ORDER MODIFYING OPINION AND CERTIFYING FOR PARTIAL PUBLICATION**<br><br>**[NO CHANGE IN JUDGMENT]** |

THE COURT:

     The opinion filed herein on February 9, 2017, was not certified for publication in the Official Reports.  For good cause it now appears that the opinion, as modified, should be partially published in the Official Reports and it is so ordered.

     It is further ordered that the opinion be modified as follows:

Page 1:
     Line 1, substitute the words "CERTIFIED FOR PARTIAL PUBLICATION\*" for "NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS" and add at the bottom the page an asterisk footnote containing the following language:  "Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is ordered certified for publication with the exception of parts II, III and IV."

Page 2:
        Delete the second full paragraph, beginning with the words "Each party," and replace it with the following paragraph:

        "Each party finds error in elements of the jury's monetary award, and in the trial court's denial of Yale's motion for prejudgment interest. [fn. 2]  In the published portion of this opinion, we conclude that the trial court correctly gave the comparative fault instruction requested by Bowne.  In the unpublished portions of this opinion we conclude that substantial evidence supports the jury's award of $260,000 in damages (to be reduced under the jury's comparative fault determination), but that the award of $57,170 for investment losses claimed by Yale was not supported by substantial evidence; nor is Yale entitled to prejudgment interest."

        The language of footnote 2 remains unchanged.  Footnote 2 reads:

        "2      Bowne does not contest the jury's finding that he was negligent."

        In the sentence beginning "Yale grew up," the word "electronic" is deleted and the word "electronics" is inserted in its place.

Page 5:  In the second to last line, the term "E.T.F.S" is deleted and the term "E.T.F.s" is inserted in its place.

Page 16:
        Delete the second full paragraph, which begins with the words: "We defer discussion . . . ."

Page 19:  In the final paragraph, beginning with the words "Yale testified," delete the second sentence, beginning with the words "Bowne points out," and replace this sentence with the following sentence: "Bowne points out that he did not cause the claimed investment loss;

2

rather it was solely a result of Yale deciding not to repurchase the same securities in mid-January 2012; he also points out, when she re-entered the market, she did so under a different investment perspective."

Page 25:
Immediately following the Disposition, substitute the words "CERTIFIED FOR PARTIAL PUBLICATION" for "NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS"

This modification makes no change in the judgment.

_____

CHAVEZ, Acting P.J.          HOFFSTADT, J.          GOODMAN, J.[†]

[†]     Retired judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.